# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Ex. Rel.* TRACY PAYTON; | ) | |
| | ) | **Civil Action No. 4:16-CV-00102** |
| STATE OF GEORGIA, | ) | |
| *Ex. Rel.* TRACY PAYTON; | ) | |
| | ) | |
| STATE OF CALIFORNIA, | ) | |
| *Ex. Rel.* TRACY PAYTON; | ) | |
| | ) | |
| STATE OF COLORADO, | ) | |
| *Ex. Rel.* TRACY PAYTON; | ) | |
| | ) | |
| STATE OF CONNECTICUT | ) | **COMPLAINT FOR VIOLATION** |
| *Ex. Rel.* TRACY PAYTON; | ) | **OF FEDERAL FALSE CLAIMS** |
| | ) | **ACT, 31 U.S.C. § 3729** *et seq.* |
| STATE OF FLORIDA, | ) | |
| *Ex. Rel.* TRACY PAYTON; | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| STATE OF ILLINOIS, | ) | |
| *Ex. Rel.* TRACY PAYTON; | ) | |
| | ) | |
| STATE OF LOUISIANA, | ) | |
| *Ex. Rel.* TRACY PAYTON; | ) | |
| | ) | |
| STATE OF MASSACHUSETTS, | ) | |
| *Ex. Rel.* TRACY PAYTON; | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| *Ex. Rel.* TRACY PAYTON; | ) | |
| | ) | |
| STATE OF NEW YORK, | ) | |
| *Ex. Rel.* TRACY PAYTON; | ) | |
| | ) | |
| STATE OF NORTH CAROLINA, | ) | |
| *Ex. Rel.* TRACY PAYTON; | ) | |
| | ) | |

Civil Action No.  4:16-CV-00102

| | |
|---|---|
| STATE OF TEXAS, | ) |
| *Ex. Rel.* TRACY PAYTON; | ) |
| | ) |
| STATE OF VIRGINIA, | ) |
| *Ex. Rel.* TRACY PAYTON; | ) |
| | ) |
| STATE OF WASHINGTON, | ) |
| *Ex. Rel.* TRACY PAYTON; | ) |
| | ) |
| Plaintiffs –Relator(s), | ) |
| | ) |
| v. | ) |
| | ) |
| PEDIATRIC SERVICES OF | ) |
| AMERICA, INC., A GEORGIA | ) |
| CORPORATION and | ) |
| PEDIATRIC HOME | ) |
| NURSING SERVICES,  INC. | ) |
| | ) |
| Defendants. | ) |

## AMENDED COMPLAINT FOR DAMAGES

On behalf of the United States of America, the States of Georgia, California, Colorado, Connecticut, Florida, Illinois, Louisiana, Massachusetts, New Jersey, New York, North Carolina, Texas, Virginia and Washington, Plaintiff/Relator Tracy Payton ("Relator") files this *qui tam* Amended Complaint against Defendants, Pediatric Services of America, Inc. and Pediatric Home Nursing Services, Inc. (hereinafter collectively "Defendants" or "PSA") and alleges as follows:

Civil Action No.  4:16-CV-00102

# I.  INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America, the States of Georgia, California, Colorado, Connecticut, Florida, Illinois, Louisiana, Massachusetts, New Jersey, New York, North Carolina, Texas, Virginia and Washington arising from various false and fraudulent statements, records, and claims made and caused to be made by the Defendants and/or their agents and employees in violation of a Corporate Integrity Agreement, the Federal False Claims Act, 31 U.S.C. § 3279 *et seq. (*"the FCA" or "the Act"), the Georgia False Medicaid Claims Act (Georgia Code § 49-4-168.1, *et seq.*), the California False Claims Act (Gov. Code § 12650, *et seq.*), the Colorado Medicaid False Claims Act (Colo. Rev. State. 25.5-4-303.5, *et seq.*), the Connecticut False Claims Act for Medicaid Assistance Programs (Conn. Gen. Stat. § 17b-301(a), *et seq.*), the Florida False Claims Act (Fla. Stat. Ann § 68.081, *et seq.*), the Illinois Whistleblower Reward and Protection Act (740 ILCS 175/1, *et seq.*), the Louisiana Medical Assistance Programs Integrity Law (LSA R.S. 46.437.1, *et seq.*), the Massachusetts False Claims Act (Mass. Gen. Laws § 5A, *et seq.*), the New Jersey False Claims Act (NJ ST. 2A:32C-1, *et seq.*), the New York False Claims Act (NY STATE FIN § 187, *et seq.*), the North Carolina False Claims Act, Code Section N.C.G.S.A. § 108A-70-10, *et seq.*), Texas Medicaid Fraud Prevention Act (TEX. HUM. RES. Code § 36.001, *et seq.*), Tex. Gov't Code

Civil Action No.  4:16-CV-00102

Ann. § 531.101, *et seq*., Virginia Fraud Against Taxpayers Act (VA CODE § 8.01 – 216.3), and Washington State Medicaid Fraud False Claims Act (RCW 77.66.005, *et seq*.) (collectively, the "State Acts").

2.     As will be set forth below in detail, within only a few days of commencing her employment as an Accounts Receivable Collector at PSA, it became clear to Relator that (i) PSA was illegally holding and not timely refunding overpayments from credit balances and unapplied cash to various government payors; (ii) a large number of critically ill patients were not being seen timely by the required nursing supervisor; (iii) patients' medical records were seriously deficient and lacked nurses' signatures; (iv) nursing notes were completely missing from patients' medical records; (v) PSA was improperly billing Medicare for denial only and then submitting rejected claims to Medicaid for a different service; (vi) PSA was submitting authorizations to commercial insurance companies for one service and then billing Medicaid for additional services that were not considered or denied by the private insurance company; and (vii) PSA failed to meet state Medicaid requirements because it was not Medicare certified and thus ineligible to participate in the state's Medicaid program.

## II.  PARTIES, JURISDICTION AND VENUE

3.     Plaintiff/Relator Payton is a citizen of the United States of America and a resident of Georgia.  Relator formerly worked for Defendants Pediatric

Civil Action No.  4:16-CV-00102

Services of America, Inc. and Pediatric Home Nursing Services, Inc. as an Accounts

Receivable ("AR") Collector from approximately August 4, 2015 until October 21,

2015.  Relator filed her original complaint in this action on September 22, 2015.

4.      Relator, a mother of three, has an associate's degree in Healthcare

Management from University of Phoenix Online and has been working in billing

and collections in the healthcare industry for approximately 18 years.

5.      The United States is the real party in interest to the claims in this

action.

6.      This civil action is also brought on behalf of the States of Georgia,

California, Colorado, Connecticut, Florida, Illinois, Louisiana, Massachusetts,

New Jersey, New York, North Carolina, Texas, Virginia and Washington against

the Defendants to redress violations and recover damages and civil penalties as

allowed under the False Claims Acts of these states.

7.      Defendant Pediatric Services of America, Inc. is a Georgia

corporation with a principal address at 6 Concourse Parkway, Atlanta, Georgia

30328.

8.      Defendant Pediatric Home Nursing Services, Inc. is a New York

corporation with a principal address at 6 Concourse Parkway, Atlanta, Georgia

30328.

Civil Action No.  4:16-CV-00102

9.     Defendants are healthcare providers who submit claims to, and receive payment from the federal government and various state governments.

10.     Defendants are the leading provider of home healthcare and related services for mentally fragile and chronically ill infants and children and are the nation's largest pediatric home healthcare provider.  PSA has approximately 70 branch offices located in 17 states[1] through at least two reportable segments (i) Pediatric and Adult Private Duty Nursing ("PDM") and (ii) Prescribed Pediatric Extended Care ("PPEC").  Defendants have office locations in Atlanta, Macon, Norcross, and Savannah, Georgia among other cities.

11.     Based on information published on its bulletin board at its Peachtree Corners Office, PSA collects between $5-6 million per week (over $300 million annually).

12.     This is a civil action arising under the laws of the United States against the Defendants to redress violations of 31 U.S.C. §§ 3729-3730.  This Court has jurisdiction over the subject matter of this action:  (i) pursuant to 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730; (ii) pursuant to 28 U.S.C. § 1331,

---

1  California, Colorado, Connecticut, Florida, Georgia, Illinois, Louisiana, Massachusetts, New Jersey, New York, North Carolina, Oregon, Pennsylvania, South Carolina, Texas, Virginia and Washington.

Civil Action No.  4:16-CV-00102

which confers federal subject matter jurisdiction; and (iii) pursuant to 28 U.S.C. § 1345 because the United States is a Plaintiff.

13.    This civil action is also brought on behalf of the States of Georgia, California, Colorado, Connecticut, Florida, Illinois, Louisiana, Massachusetts, New Jersey, New York, North Carolina, Texas, Virginia and Washington against the Defendants to redress violations and recover damages and civil penalties as allowed under the False Claims Acts of these states.

14.    This Court has jurisdiction over Defendants under 31 U.S.C. § 3732(a) because PSA can be found in, is authorized to transact business in, and is now transacting business in this District.  In addition, acts proscribed by 31 U.S.C. § 3729 have occurred in this District.

15.    Venue is proper in this District because Defendants conduct business in this District and because some of the acts giving rise to this action occurred within this District.

16.    There has been no public disclosure of substantially the same allegations or transactions alleged in this Complaint (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a Congressional, Government Accountability Office or other Federal report, hearing, audit, or investigation; or (iii) from the news media.

Civil Action No.  4:16-CV-00102

17.    To the extent that there has been a public disclosure, the Relator is the original source under 31 U.S.C. § 3730(e)(4) and the relevant state whistleblower statutes.  Relator is an individual who has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

18.    In accordance with 31 U.S.C. §3730(b)(2), the original complaint was filed *in camera*, remained under seal for a period of at least 60 days, and was not served on the Defendants until the Court ordered.

19.    As the United States Attorney for the Southern District of Georgia and the State of Georgia have declined to intervene in the instant action, and as the seal on this case has been lifted, this Amended Complaint is not being filed under seal.

## III.   RELEVANT LAW

### I.   Applicable Statutes and Regulations

#### A.   Medicare

16.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program.  Medicare is a federally-funded health insurance program primarily benefiting the elderly.  Entitlement to Medicare is based on age, disability or affliction with end stage renal disease.  *See* 42 U.S.C. § 426, *et seq.*

Civil Action No.  4:16-CV-00102

17.     Part A of the Medicare Program, the Basic Plan of Hospital Insurance, authorizes payment for institutional care, including hospital services and post-hospital nursing facility care.  *See* 42 U.S.C. §§ 1395c-1395i-4.

20.     Part B of the Medicare Program, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider. Medicare pays providers only for services that it considers "reasonable and necessary for the diagnosis or treatment of illness or injury…." Social Security Act § 1862(a)(1)(A).

21.     Providers who wish to participate in the Medicare program must ensure, among other things, that their services are provided "economically and only when, and to the extent, medically necessary."  42 U.S.C. § 1320c-5(a).

22.     The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

23.     To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries."  42 U.S.C. § 1395h.  Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

Civil Action No.  4:16-CV-00102

24.     Medicare enters into provider agreements with providers to establish the provider's eligibility to participate in the Medicare program.  Regulations for Medicare reimbursement include an annual review of healthcare operations and provide criteria for coverage and reimbursement.

25.     Under Medicare Part B, "Medicare carriers" are responsible for accepting and paying claims for certain reimbursements under Medicare Part B.

26.     In addition, each provider must sign a provider agreement as a condition of participation that agrees to comply with all Medicare requirements including the fraud and abuse provisions.  A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.  By submitting a claim for Medicare reimbursement, the provider certifies that the submitted claim is eligible for Medicare reimbursement and that the provider is in compliance with all Medicare requirements.

27.     As a prerequisite to payment for Medicare, CMS requires home health agencies to submit annually a Form CMS-1728 (previously Form HCFA-1728), more commonly known as Cost Reports.  Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

28.     Home Health Agency Cost Reports contain a "Certification" that must be signed by an officer or director of the Home Health Agency as follows:

Civil Action No.  4:16-CV-00102

> Sections 1877(a) and 1901(a)(1) of the Social Security Act state that, "Whoever knowingly and willfully makes or causes to be made any false statement or representation of material fact in any application for any benefit or payment under this title–shall (i) in the case of such a statement, representation, concealment, failure or conversion by any person in connection with the furnishing (by that person) of items or services for which payment is or may be made under this title, be guilty of a felony and upon conviction thereof fined not more than $25,000 or imprisoned for not more than 5 years, or both, or (ii) in the case of such statement, representation, concealment, failure or conversion by any other person, be guilty of a misdemeanor and upon conviction thereof fined not more than $10,000 or imprisoned for not more than 1 year or both."

29.    In order to bill Medicare electronically a Home Health Agency must execute an Electronic Data Interchange ("EDI") Enrollment Form and agree to "be responsible for all Medicare claims submitted to CMS by itself, its employees, or its agents," and to "submit claims that are accurate, complete, and truthful."

30.    By executing the EDI Enrollment Form, a provider also acknowledges:

> that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim as required by this Agreement may, upon conviction be subject to a fine and/or imprisonment under applicable Federal law.

31.    Medicare beneficiaries receiving home health care may also be eligible for Medicaid, depending on their financial resources or disability status.

**B.    Medicaid, Tricare, Champus, and Indian Health Services**

Civil Action No.  4:16-CV-00102

32.     Medicaid was also created in 1965 under Title XIX of the Social Security Act as a joint federal and state program to provide financial assistance to individuals with low incomes to enable them to receive medical care.   Under Medicaid, each state establishes its own eligibility standards, benefit packages, payment rates and program administration in accordance with certain federal statutory and regulatory requirements.

33.     The state pays the health care providers for services rendered to Medicaid recipients, with the state obtaining the federal share of the Medicaid payment from an account that draws on the United States Treasury.  *See* 42 C.F.R. §§ 430.0-.30.

34.     The federal government portion provided is known as the Federal Medical Assistance Percentage ("FMAP") and is based on the state's per capita income compared to the national average.  *See* 42 U.S.C. § 1396d(b).

35.     In some states Medicaid is subcontracted to private health insurance companies, while other states pay providers (i.e., doctors and hospitals) directly.

36.     Participation in Medicaid is voluntary, however "once a State elects to participate, it must comply with the requirements of Title XIX." *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 809, 12 69 P. 3d 927, 935 (2003) (quoting *Harris v. McRae*, 448 U.S. 297, 308 (1980)).

Civil Action No.  4:16-CV-00102

37.    Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services (the "Secretary").    After the Secretary approves the plan submitted by the state, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan.  42 U.S.C. § 1396(a)(1).  This reimbursement is called "federal financial participation" ("FFP").

38.    All Medicaid state plans must cover a certain set of basic benefits ("mandatory benefits").  These benefits include but are not limited to inpatient and outpatient hospital services; rural health online services; federally qualified health center services; laboratory and X-ray services; physician services; and certain home health care benefits.

39.    Like Medicare, a "claim" under Medicaid is only "covered" if it is "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 C.F.R. § 402.3.

40.    Services "excluded from Medicare Part B" or that are "not a defined Medicare Part B benefit" are not covered by Medicaid. *Id.*

Civil Action No.  4:16-CV-00102

41.   Each home healthcare agency that participates in the Medicaid program must sign a Medicaid provider agreement with each state it has a Medicaid enrollment site with.  Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree to comply with all Medicaid requirements, including the fraud and abuse provisions.

42.   As a condition of participation in Medicaid programs providers are required to certify in Georgia for example as follows (Billing Manual, Attestation of Compliance) as follows:

> I hereby attest that, as a condition for the above-identified Covered Entity to receive payments under the Georgia Medicaid/PeachCare for Kids Program, I have read Section 6032 if the Deficit Reduction Act of 2005 (the Act) and confirm that:
>
> - The Covered Entity's policies and procedures contain detailed information about the Federal laws identified in Section 6032(A) and about Georgia's laws imposing civil or criminal penalties for false claims and statements, and about whistleblower protections under such laws as found in the Sate False Medicaid Claims Act, Article 7B of Chapter 4 of Title 49 of the Official Code of Georgia; and
>
> - The Covered Entity's written policies and procedures also contain detailed information regarding its own policies and procedures to detect and prevent fraud, waste and abuse in Federal health care programs, including the Medicare and Medicaid Programs; and
>
> - The Covered Entity provides copies of its written policies to its employees (including management), and to any of

Civil Action No.  4:16-CV-00102

> its contractors and agents that perform billing or coding functions for the Covered Entity, or that furnish or authorize the furnishing of Medicaid health care items or services on behalf of the Covered Entity, or that are involved in monitoring of health care provided by the Covered Entity; and

> •   The Covered Entity's written policies and procedures are included in any employee handbook maintained by the Covered Entity.

> I also confirm that the Covered Entity includes the Georgia Medicaid/PeachCare for Kids providers identified on Attachment A.

43.    Most states have adopted similar certification as a result of the Deficient Reduction Act of 2005.

44.    In 1995, the Department of Defense established Tricare, a managed healthcare program, which operates as a supplement to Champus.  *See* 32 C.F.R. §§ 199.4, 199.17(a). The purpose of the Tricare program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. § 199.17(a)(1). The Tricare Management Activity ("TMA") oversees this program.

45.    Champus beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel. 10 U.S.C. § 1071.

46.    Indian Health Services ("IHS"), a division of the Department of Health and Human Services, is the Federal Health Program for American Indians and Alaska Natives.  The Indian Health Care Improvement Act of 1976 allows IHS

Civil Action No.  4:16-CV-00102

to bill for medical services provided by IHS facilities to Indians eligible for Medicare and Medicaid.

47.    Just as with Medicare and Medicaid, Tricare, Champus and Indian Health Services providers have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent  medically necessary." 32 C.F.R. § 199.6(a)(5).

## II.    The False Claims Act & the Patient Protection and Affordable Care Act

48.    The False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), *available at* 1986 U.S.C.C.A.N. 5266.

49.    As relevant here, the FCA establishes civil penalties and treble damages liability to the United States for an individual or entity that:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G).

50.    The FCA was recently amended by the Fraud Enforcement and Recovery Act of 2009, ("FERA"), Public Law 111-21, which President Obama signed into law on May 20, 2009.  FERA further expanded the scope of the FCA to

Civil Action No.  4:16-CV-00102

ensure that the government can recover taxpayer dollars purportedly lost to fraud and abuse.  FERA expanded the FCA, with the intent to eliminate many defense arguments, and to reverse a Supreme Court decision regarding subcontractors.  *See* S. Rep. 111-10, 11th Cong. 1st Sess. 10-13 (March 23, 2009).

51.    Section § 3729(a)(1)(A) now holds liable any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

52.    Section § 3729(a)(1)(B) now holds liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

53.    As amended by the FERA, the reverse false claims provision now imposes liability for any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or **knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government**."

31 U.S.C. §3729(a)(1)(G) (emphasis added).

54.    As defined in the FCA, the terms "knowing" and "knowingly" encompass "actual knowledge" as well as situations in which a person "acts in deliberate ignorance" or "reckless disregard" of the truth or falsity of information.

Civil Action No.  4:16-CV-00102

*Id*. 31 U.S.C. §3729(b)(1)(A).   This knowledge standard expressly requires no proof of specific intent to defraud.  31 U.S.C. §3729(b)(1)(B).

55.     On March 23, 2010, less than a year after the FERA was signed into law, Congress passed the Patient Protection and Affordable Care Act (Pub. L. 111-148).   The Health Care Education Reconciliation Act of 2010 (Pub. L. 111-152) then amended certain provisions of Public Law 111-148. These public laws are collectively known as the Affordable Care Act

**III.    Settlement Agreements and Corporate Integrity Agreement**

56.     In early August 2015, PSA entered into settlement agreements in connection with two previously filed and intervened federal and state false claims cases against several defendants including Pediatric Services of America, Inc. and Pediatric Home Nursing Services, Inc. (the "Settlement Agreements").   *See U.S. ex rel. Yvette Odumosu v. Pediatric Services of America Healthcare*, No. 1:11-CV-1007-AT and  *U.S. ex rel. Sheila McCray, et al. v. Pediatric Services of America, Inc.*, *et al*., Civil Action No. CV413-127.

57.     The Settlement Agreements stated in part:

 a.)     Between January 1, 2008 and July 31, 2011, PSA knowingly submitted claims for services rendered by licensed practical nurses (LPN's) under the Georgia Pediatric Program (GAPP) out of PSA's Norcross and Savannah locations that were not reimbursable under the Georgia Medicaid program because of PSA's failure to document that it had conducted the monthly supervisory visits by a registered nurse (RN) as required by GAPP;

18

Civil Action No.  4:16-CV-00102

b.)   PSA knowingly failed to return overpayments that it received from federally-insured health programs, including TRICARE/TriWest and the state Medicaid programs of Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Louisiana, Ohio, Massachusetts, New Jersey, New York, North Carolina, Oregon, Pennsylvania, South Carolina, Texas, Virginia and Washington between January 1, 2007 and June 30, 2013  on claims submitted by PSA to the federally-insured health programs;

c.)   Between January 1, 2008 and October 31, 2014, PSA's locations in California, Colorado, Connecticut, Florida, Georgia, Louisiana, North Carolina, New York, Pennsylvania, South Carolina, Texas and Virginia knowingly submitted claims to those states' Medicaid programs for services that overstated the length of time that the services were rendered due to the fact that PSA's payroll and billing systems double rounded minutes worked between 23 and 30 minutes;

d.)   Between January 1, 2008 and October 31, 2014, PSA' knowingly submitted claims to TRICARE/TriWest for services that overstated the length of time that the services were rendered due to the fact that PSA's payroll and billing systems double rounded minutes worked between 23 and 30 minutes.

The timeframes referenced in the Settlement Agreement are the "Covered Conduct" period.

58.   In connection with the Settlement Agreements, in July 2015, Pediatric Services of America, Inc. and certain affiliates (including these Defendants) entered into a Corporate Integrity Agreement ("CIA") with the Office of the Inspector General for the Department of Health and Human Services ("HHS"), a copy of which is attached as Exhibit 1.

Civil Action No.  4:16-CV-00102

59.    The CIA is an express contract between PSA and the United States Government.

60.    Since the execution of that CIA, PSA's Compliance Committee has been ineffective and has flagrantly continued to disregard and give lip service to the terms of the CIA and grossly violate the terms of the CIA.

**IV.    PSA's Compliance Policies**

61.    PSA also has a significant number of published Compliance Policies relating to assuring Compliance with all relevant Federal, State and local laws and regulations.  The Compliance Policies were available to the Relator and other PSA employees on PSA's Intranet.

62.    As stated in the "PSA Healthcare Compliance Program" memo, among other things. . .

> (5)    The Company maintains an "open door" policy for reporting issues and concerns. . . . Lastly, in order to ensure open and candid reporting, the Company has formally established a Non-Retaliation policy which empowers workforce members to report voice allegations or concerns without fear of reprisal or retribution.

> (7)    The Company has established formal processes to facilitate the appropriate response and correction of violations of law, regulation, policy, etc.  A formal protocol has been established for the investigation and resolution of compliance issues, including measures to prevent similar conduct.

> Any supervisor who receives a complaint or report of misconduct concerning a potential compliance issue is

Civil Action No.  4:16-CV-00102

> required to promptly notify the CCO for investigation
> and follow up.

63.   The PSA Compliance with Local, State and Federal Laws and Regulations stated:

> All workforce members are expected to be familiar and comply
> with all clinical, legal, regulatory and ethical requirements that
> pertain to the performance of their assigned duties and
> responsibilities.

> PSA maintains both an open door policy, as well as, a non-
> retaliation – intimidation policy to facility open and candid
> communications without fear of reprisal.

64.   PSA' Suspected Fraudulent Documentation memo stated, among other things:

> Federal and State False Claims acts prohibit the knowing and/or
> use of false or fraudulent claims, records or statements for the
> purpose of obtaining payment from any government funded
> program.  These laws apply to Medicare and Medicaid program
> reimbursement . . . falsifying cost reports; . . . participating in
> kickbacks; and retaining overpayment for services or items.

> A violation may result in civil, criminal and/or administrative
> penalties, including monetary penalties (treble damages),
> imprisonment, and exclusion from participation in federally
> funded programs such as Medicare and Medicaid, and loss of
> licensure status.

> Any location manager who suspects that an employee . . . has
> submitted falsified documents with respect to the provision or
> billion ordered services shall immediately notify the Chief
> Compliance Officer and the VP of Business Operations of the
> potential wrongdoing.

Civil Action No.  4:16-CV-00102

65.    This memo goes on to describe corrective action which was not to

Relator's knowledge taken in this matter:

> Upon completion of the investigation, or when facts support wrongdoing, the CCO will coordinate with the VP of People Services, General Counsel, VP of Business Operations, Corporate Reimbursement Manager, etc. to determine the appropriate corrective action based on the facts and circumstances.  This may include:
>
> • Notifying the payor source of the issue and pending reimbursement, if applicable
>
> • Contacting the appropriate regulatory and legal authorities.
>
> Based on the circumstances, the CCO may also recommend "global" (e.g. policy revisions, training, other audits regarding similar scenarios, etc.) in order to prevent future similar occurrences.

66.    Finally PSA's Compliance Corrective Action memo is most telling

stating and incriminating in this case, among other things:

> When a compliance investigation confirms that a violation of law, regulation or Company policy has occurred, the CCO has a responsibility to report such find and recommend appropriate corrective action.  Depending on the circumstances, self-disclosure may also be required ("voluntarily" self-reporting matters of noncompliance).  For example, the False Claims Act (FCA) and the Patient Protection and Affordable Care Act (PPACA) arguably create a duty to disclose a known false claim or overpayment.  Self-disclosures are generally required to be filed within 60 days from the time that PSA became aware of the matter; however, to whom the disclosure should be made is very much a case-by-case determination.
>
> The OIG's Compliance Program Guidance not only requires prompt and effective correction action specific to the violation

Civil Action No.  4:16-CV-00102

(e.g., disciplinary action, reporting and refund, etc.), but also requires that reasonable steps be taken to prevent similar problems in the future.  This type of corrective action is generally more global in nature and includes, but is not limited to:

- revising policies and procedures;

- altering existing operating processes;

- altering or enhancing internal controls;

- modifying or developing training programs;

- implementing a corporate communication plan to reinforce existing policies or changes.

- All workforce members are expected to be familiar and comply with all clinical, legal, regulatory and ethical requirements that pertain to the performance of their assigned duties and responsibilities.

## IV.    PSA'S FRAUDULENT SCHEMES

67.    On or about August 4, 2015, Relator began working as an AR Collector at PSA's Norcross, Georgia office.  Her job responsibilities required her to use reports, tools, and other resources provided by PSA to handle aged patient accounts for the sole purpose of collecting the very highest possible percentage of every billed account.

68.    The position required her to maintain close contact with branch location personnel while consistently attempting to ensure maximum payment from all payors.  This included claims to commercial, Medicare, Medicaid, Tricare, commercial insurance and private payor accounts.

Civil Action No.  4:16-CV-00102

69.    Relator's essential job duties include but were not limited to:

    a.    Work and collect delinquent AR accounts;

    b.    Document collection efforts in Encore notes screens to include payor contacts, phone numbers, issues, actions taken, etc.;

    c.    Maintain current AR at an acceptable percent;

    d.    Keep supervisor, and branch location personnel informed of any significant collection payor or processing issues;

    e.    Submit adjustments in an accurate and timely manner;

    f.    Work with Biller to ensure claims are refiled and/or billed to the second insurance in a timely manner;

    g.    Understand payor specific requirements for submitting claims (i.e. includes CMN's, nursing notes, invoices, etc.);

    h.    Review and respond to correspondence received from payors;

    i.    Address denials in an accurate and timely manner; and

    j.    Other duties as assigned by supervisor.

70.    During her employment, Relator was privy to and aware of many irregularities involving improper revenue recognition, improper billing practices, fraudulent statements, incomplete records, and other fraudulent practices.

71.    Relator also learned that PSA did not have Medicare provider agreements or certifications in many of the states in which PSA did business and was thus ineligible to bill the state Medicaid programs.

72.    Throughout her tenure at PSA, Relator repeatedly brought PSA's improper billing practices; retention of overpayments and unapplied cash; and inadequate and missing nursing notes to the attention of her Merab Carty

Civil Action No.  4:16-CV-00102

(Relator's Manger); Samuel Blackman (Relator's Team Lead); Debbie Lewis (PSA Vice President, Operations Development); Patrick Cunningham (PSA's Chief Compliance Officer) and others.

73.    When Relator's concerns fell on deaf ears, or PSA provided inadequate and improper justifications for its actions, Relator resolved that PSA had failed to progress from the prior settlement, was in violation of its CIA, its own corporate policies, and would continue to profit from the false claims it presented and obligations that it failed to return.

74.    PSA's unreformed practices were and are designed to defraud Medicare and Medicaid.

75.    Had the schemes described herein including continuing to conceal and keep overpayments been known (i) to officials with Medicare and the State Medicaid programs, all payments would have been terminated and no funds from Medicare or Medicaid would have been paid to PSA (ii) HHS would have suspended PSA from providing service to the Federal government and instituted action against PSA for violations of the CIA and (iii) DOJ would have taken action against PSA for breach of the Settlement Agreements and related agreements.

76.    In the alternative, PSA would never have been allowed to enter into contracts with Medicaid and Medicare, and none of the contracts between

Civil Action No.  4:16-CV-00102

Medicare/Medicaid and PSA existing at the time that this scheme commenced would have been renewed.

77.     Upon information and belief, the fraudulent schemes described in the paragraphs below continue unabated.

78.     Defendants have engaged in a cover-up, have engaged in significant additional fraudulent conduct and cover-up, and continue to submit false claims to the United States Government including the state Medicaid programs as described herein.

79.     Although the precise amount of the loss to the federal and state governments cannot presently be determined, it is estimated that the damages and civil penalties that may be assessed against the Defendants under the facts alleged in this Amended Complaint amount to tens of millions of dollars.

## CLAIM NO. 1

**PSA concealed and failed to promptly report and return overpayments to the Medicaid and Tricare programs in California, Colorado, Connecticut, Florida, Georgia, Illinois, Louisiana, Massachusetts, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas, Virginia, and Washington from December 2014 through at least October 15, 2015. Additionally, PSA failed to return overpayments in its unapplied cash account since November 30, 2005**

80.     The FERA amended the FCA by defining an "obligation" to mean an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or

Civil Action No. 4:16-CV-00102

similar relationship, from statute or regulation, or **from the retention of any overpayment**." 31 U.S.C. § 3729(b)(3). (Emphasis added).

81.     Under the FCA, an act of "concealment" can also be a felony. In addition, the duty to disclose provisions of the 1977 amendments to the Social Security Act 42 U.S.C. § 1320a-7(b)(a)(3) makes concealing from the Government or failing to report Medicare overpayments a felony. Under the "duty to disclose provision" healthcare providers and others who conceal or fail to disclose that they have received larger payments than they are entitled to be guilty of a felony and could be imprisoned for up to five years and fined up to $25,000. Their employees, including auditors, who conceal these overpayments, may also be guilty of at least a misdemeanor and subjected to fines.

82.     CMS requires Medicare providers to submit Form CMS-838 within 30 days after the close of the calendar quarter, and include all Medicare credit balances shown in the providers accounting records as of the last day of the reporting quarter. Providers must pay all amounts owed at the time the credit balance report is submitted.

83.     A home health care agency such as PSA is required to disclose all errors and omission in its claim for Medicare reimbursement (including its Cost Reports) to its fiscal intermediary.

Civil Action No.  4:16-CV-00102

84.     The Medicare Secondary Payer Manual specifically creates a duty to

disclose known errors in cost reports.

> Whosoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such payment or benefit is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

> The Medicare Secondary Payer (MSP) Manual (Rev. 87, 08-03-12) (www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/ downloads/ msp105c03.pdf) regulations at 42 CFR 489.20 require providers to pay Medicare within 60 days from the date a payment is received from another payer (primary to Medicare) for the same service for which Medicare paid.  A provider refunds the Medicare payment within 60 days by submitted an adjustment bill or via the Medicare Credit Balance Report.  The MSP regulations at 42 CFR 411.24(h) and 411.25 require all entities that receive a primary payment from both Medicare and a primary plan to repay Medicare. A physician or other supplier submits a refund check to Medicare. This refund is due Medicare, regardless of which payment the provider, physician, or other supplier received first and even if the insurance payment was refunded to the beneficiary or the insurer.

> Providers report credit balances resulting from MSP payments on the Form CMS-838 if the overpayment has not been repaid by the last day of the reporting quarter.  If the provider identifies and repays an MSP credit balance within a reporting quarter, in accordance with the 60-day requirement, it is not reported on the Form CMS-838, i.e., once payment is made, a credit balance would no longer be reflected in the provider records.

> If an MSP credit balance occurs late in a report quarter, and the Form CMS-838 is due prior to expiration of the 60-day requirement, the overpayment must be included in the credit balance report.  However, payment of the credit balance does not have to be made at the time the Form CMS-838 is submitted, but within the 60 days allowed.

Civil Action No.  4:16-CV-00102

85.    Home Health Agencies such as PSA are also required to file Medicaid Credit Balance Report Forms when they have identified an outstanding overpayment or credit balance.

86.    The Affordable Care Act made a number of changes to the Medicare program that enhance the Government's efforts to recover overpayments and combat fraud, waste and abuse in the Medicare program.

87.    The Affordable Care Act amended the Social Security Act by adding a new provision, Section 1128J(d),  that addresses what constitutes an overpayment under the FCA in the context of a federal health care program.  Under this section, an overpayment is defined as "any funds that a person receives or retains under Title XVIII or XIX to which the person, after applicable reconciliation, is not entitled."  *See*  42 U.S.C. § 1320a-7k(d)(4)(B).

88.    The statute sets a deadline for such reporting and returning:   An overpayment must be reported and returned within sixty days of the "date on which the overpayment was *identified*" or the date any corresponding cost report is due, if applicable.  *Id*. § 1320a-7k(d)(2) (emphasis added).

89.    Any overpayment retained beyond that point constitutes an "obligation" carrying liability under the FCA.  *Id.* § 1320a-7k(d)(3).

90.    In other words, the Affordable Care Act provides that any person who has received an overpayment from Medicare or Medicaid and knowingly fails to

Civil Action No.  4:16-CV-00102

report and return it within sixty days after the date on which it was identified has

violated the FCA.  *Id.* § 1320a-7k(d).

91.    The report and return provision does not define the terms "knowing"

or "knowingly," but the provision contains its own succinct "Definitions" section

which provides that "knowing" and "knowingly" should "have the same meaning

given those terms in [the FCA].  *Id.* § 1320a-7k(d)(4)(A).

92.    The FCA defines "knowing" and "knowingly" to  "mean that a person

with respect to information—(i) has actual knowledge of the information; (ii) acts

in deliberate ignorance of the truth or falsity of the information; or (iii) acts in

reckless  disregard  of  the  truth  or  falsity  of  the  information."  31  U.S.C.

§ 3729(b)(1)(A).

93.    The Centers for Medicare & Medicaid Services ("CMS") has also

taken steps in the government's comprehensive efforts to identify improper

Medicare payments, fight fraud, waste and abuse in the Medicare program.  In

February 2016, CMS issued their final rule interpreting Section 1128J9(d) of the

Affordable Care Act regarding reporting and returning overpayments.

> This  final  rule  states  that  a  person  has  **identified**  an
> overpayment **when the person has or should have, through
> the  exercise  of  reasonable  diligence,  determined  that  the
> person  has  received  an  overpayment  and  quantified  the
> amount  of  the  overpayment.**  Creating  this  standard  for
> identification  provides  needed  clarity  and  consistency  for
> providers  and  suppliers  on  the  actions  they  need  to  take  to

Civil Action No. 4:16-CV-00102

> comply with requirements for reporting and returning of self-identified overpayments."

81 R. 7654-01, 7654 (emphasis added).

94.    Section 1128J(d)(4)(C) of the Act defines the term "person" as a provider of services, supplier, Medicaid managed care organization (MCO) (as defined in section 1903(m)(1)(A) of the Act), Medicare Advantage (MA) organization (as defined in section 1859(a)(1) of the Act) or prescription drug plan (PDP) sponsor (as defined in section 1860D-41(a)(13) of the Act). Section 1128J(d)(4)(C) of the Act excludes beneficiaries from the definition of person.

95.    CMS's final rule further states that "[t]he 60-day time period begins when either the reasonable diligence is completed or on the day the person received credible information of a potential overpayment if the person failed to conduct reasonable diligence and the person in fact received an overpayment." 81 F.R. 7654-01, 7661.

96.    Form CMS-838 also states "you are responsible for reporting and repaying all improper and excess payments you have received from the time you began participating in the Medicare program."

97.    A similar report called a Credit Balance Report Form is used for Medicaid overpayments in various states. These forms require the representative to certify that the "information is complete and accurately reflects the provider's credit balance obligation to Medicaid". *See e.g.*, Part I Policies and Procedures for

Civil Action No.  4:16-CV-00102

Medicaid/PeachCare for Kids, Georgia Department of Community Health Division of Medicaid, *Instructions for Completing Medicaid Credit Balance Report Forms*, Revised:  October 1, 2011.

98.    In various state Medicaid programs, home health agencies and other providers, are required by virtue of state law and Provider Agreements to promptly return overpayments as soon as it is discovered or reasonably should have been or similar language.

99.    Healthcare providers such as PSA are responsible for ensuring their Medicare and Medicaid claims are accurate and complete and are encouraged to have effective compliance programs as a way to avoid receiving or retaining overpayments.

100.   Failure to return any overpayment, such as each of the claims on which PSA received an overpayment from Medicare, Medicaid, or Tricare constitutes a reverse false claim actionable under section 3729(a)(1)(G) of the False Claims Act.  Under the Act, the Government is entitled to recover three times the amount of each claim, and for each claim or overpayment, a civil penalty not less than $5,500 and not more than $11,000.[2]

---

[2] Violations that occurred on or before November 2, 2015 and assessments made before August 1, 2016 (whose associated violations occurred after November 2, 2015) are assessed at $11,000 to $21,563 per penalty.

Civil Action No.  4:16-CV-00102

101.   Prior to the entry of the CIA, PSA had a policy and procedure titled "Refund of Overpayments" which states the Accounts Receivable Department is responsible "for correcting any billing errors recognized and/or reported by payors, clients, the Reimbursement Department, or by other PSA staff."  The Policy further provides, "It is the policy of the Company to **regularly monitor accounts with credit balances**, conduct research to determine whether an overpayment has occurred, and take appropriate steps to refund overpayments in a timely manner." *See* Exhibit 2 PSA Policy, *Refunds of Overpayments*, Revised Mar. 14, 2013. (Emphasis added).

102.  PSA's CIA also contains a provision on the repayment of overpayments including a definition of overpayment, policies and procedures to be implemented (to the extent they were not already completed)[3], certification statements regarding overpayments, and the steps to be taken after an overpayment is identified.  *See* Exhibit 2 at Section I.

103.   Pursuant to the express terms of the CIA contract, PSA had an existing obligation to report and refund money within 60 days after identification of the overpayment.  *Id*.

104.   All PSA AR Collectors including Relator would go to the PSA Intranet to see the "Aging Accounts Receivable Report" (hereinafter "AR

---

[3] *See* Exhibit 2.

Civil Action No.  4:16-CV-00102

Report").  The AR Report is updated and generated every night.  AR Collectors in the business office have access to the same AR Report which depicts credit balances from all states PSA does business in.

105.   The "Unapplied Cash Report" is also generated on a daily basis and is accessible to all AR Collectors in the business office.

106.   To access the AR and Unapplied Cash Reports, Relator would go into the PSA Intranet, go to the PSA Employee Portal homepage, select "Infoview" and go to "Inbox".  Once at the Inbox level, she could see all of the service locations that PSA has.

107.   Under the "SSC folder" there is a folder titled "Report Application Reports" folder which contains the AR Report and Unapplied Cash Report (among others).

108.   Collectors use the AR Report to see outstanding unpaid claims from the insurance carrier, outstanding balances from the insurance carrier, and claims that have been denied by an insurance carrier that they are assigned to work on. Additionally this report reflects credit balances greater than $0.00 for claims that PSA received in excess of the amount they billed for.

109.   The AR Report has fields/columns for the following:

     a.     Assigned AR Collector;

     b.     Patient name (first and last);

Civil Action No.  4:16-CV-00102

     c.     Patient ID;

     d.     Payor Name (including the state of the payor);

     e.     Payor group (Medicare, Medicaid, Tricare, etc.);

     f.     Dates separating claims out that are 1-30 days old; 31-60 days old; 61-90 days old; and over 120 days old;

     g.     Claim number for the credit balance;

     h.     Total amount of the credit balance;

     i.     A "notes" column which states the Collector's last note from the patient's account and attaches it to the AR Report;

     j.     An "age" column stating the age of the credit balance (measured in days);

     k.     A "min_dos" column which time stamps the last action taken on that account by the Collector;

     l.     A "last event" column which identifies the date and time stamp of the last action taken by the PSA employee;

     m.     A "last event type" column describes the action taken; and

     n.     A "reason" column which depicts the reason for the last actions taken on the patient's account by the Collector.

110.  When the Relator opened the AR Report she would click her name from the collector column and filter the report to show all of her assigned accounts.

111.  Relator's job responsibilities included collecting maximum reimbursement for unpaid claims as well as identifying credit balances.

112.  Credit balances arise from overpayments made to healthcare providers, like PSA.

Civil Action No. 4:16-CV-00102

113. Relator was responsible for reviewing credit balances and when applicable, submitting refund requests to another department within PSA for credit balances greater than $0.00.

114. In order to identify credit balances and potential overpayments Relator went to the "Total" column, then filtered the total amount from smallest to largest and then she extracted all credit balances greater than 60 days.

115. Relator identified multiple claims requiring refunds but that had not been issued back to the insurance carrier.

116. Concerned that PSA was violating Federal and State law (as well as the CIA) by not promptly returning overpayments, on October 15, 2015, Relator sent an email to Patrick "Paddy" Cunningham, PSA's Chief Compliance Officer, and Doddie Gartman Sutton, inquiring why refunds were not being returned to Medicaid and Medicaid HMO payers. Her email states, "currently on the AR there are 6,041 accounts greater than 60 days showing with credit balance totaling –(1,726,531.68) from 60 days to 365 [days] there are 4,201 claims totaling –(843,036.04)." A copy of Relator's October 15, 2015 email to the PSA Compliance department is attached hereto as Exhibit 3.

117. From approximately December 4, 2014 through August 17, 2015, Relator was able to identify approximately credit balances that resulted in $613,949.46 in unreturned overpayments paid to PSA by Medicaid and Tricare.

Civil Action No.  4:16-CV-00102

These overpayments were owed back to the State Medicaid programs of California, Colorado, Connecticut, Florida, Georgia, Illinois, Louisiana, Massachusetts, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas, Virginia, and Washington, as well as the Tricare programs in California, Colorado, Connecticut, Florida, Georgia, Louisiana, Pennsylvania, North Carolina, Texas, Virginia, and Washington.  *See* Exhibit 4.

118.   The amounts owed to each state are broken down in the table below:

| State | Amount of Overpayment paid by Medicaid/Medicaid HMO and Tricare |
|---|---|
| Pennsylvania | $  234,124.71 |
| Florida | $  111,853.16 |
| Texas | $    77,200.40 |
| Massachusetts | $    33,377.69 |
| North Carolina | $    31,538.56 |
| New York | $    27,358.63 |
| Illinois | $    20,928.68 |
| New Jersey | $    16,681.00 |
| Washington | $    16,588.90 |
| Virginia | $    11,222.66 |
| Colorado | $      9,941.67 |
| Georgia | $      7,760.18 |
| Louisiana | $      7,554.05 |
| Connecticut | $      5,552.54 |
| South Carolina | $      1,881.80 |
| California | $        384.83 |
| **Total** | **$  613,949.46** |

119.   As recognized in its own policies, PSA knew that overpayments could be in accounts with credit balances.  *See* Exhibit 2.

Civil Action No.  4:16-CV-00102

120.   Additionally, Exhibit 3 has notes from PSA Collectors specifically identifying overpayments that continued to go un-refunded to the Government.

121.   As late as October 15, 2015, Relator provided credible information that supports a reasonable belief that multiple overpayments may have been received.

122.   Additionally, the Relator identified hundreds of overpayments due to receipt of payments with insufficient or no documentation in what PSA called an "Unapplied Cash Report" (suspense or holding account).

123.   As per of her duties and responsibilities, Relator would call an insurance carrier to inquire why PSA had not received payment for an outstanding claim.  On rare occasions the insurance carrier would state that a claim had in fact been paid to PSA.  At that time, Relator go into the Unapplied Cash Report and would ask the carrier to identify the check number, the payment amount, the date of payment, or the date of service to perform a key-word search to see if the payment had indeed been paid and matched up to any of the entries in the Unapplied Cash Report.

124.   The Unapplied Cash Report Relator generated on September 16, 2015 has approximately $955,696.70 of unapplied cash sitting in an account.   *See* Exhibit 5, Selected Pages from Unapplied Cash Report.  Some of the cash has been sitting in the account since October 2005.

Civil Action No.  4:16-CV-00102

125.   The Unapplied Cash Report at Exhibit 5 contains overpayments from commercial and private payors as well as Medicaid and Tricare payors.

126.  Relator's counsel has created a spreadsheet which reflects approximately $356,254.71 in overpayments from state Medicaid and Tricare programs since July 6, 2010.  *See* Exhibit 6.  These overpayments are sitting in PSA's Unapplied Cash Report.

127.  PSA had an established duty to report and return wrongly collected money.

128.  PSA was not entitled to the funds identified in the Unapplied Cash Report and credit balances from the AR Report.

129.  After the credit balances and unapplied cash which constitute overpayments were identified, PSA could have self-reported to OIG or taken the remedial steps under the voluntary refund process.

130.  Upon information and belief PSA omitted these unapplied cash reports from OIG auditors.

131.  Upon information and belief, PSA failed to self-report the overpayments and unapplied cash that the Relator identified to OIG or under the voluntary refund process.

132.  Upon information and belief, PSA submitted a false certification to OIG falsely attesting that they were in compliance with all of the requirements of the

Civil Action No.  4:16-CV-00102

CIA, including compliance with the reporting of overpayments within 60 days of their identification.

133.   Upon information and belief, upon receiving Relator's email, PSA did nothing with the set of claims she identified as potentially overpaid.

134.   PSA failed to follow its own policies and conduct research to determine whether an overpayment had occurred and take the appropriate steps to refund the overpayment in a timely manner.  *See* Exhibit 2.

135.   Upon information and belief, the overpayment certification executed by PSA's Chief Compliance Officer is thus materially false and violates the express terms of the CIA by failing to report and refund overpayments within 60 days of their identification.

136.  PSA failed to exercise reasonable diligence by conducting an investigation in response to obtaining credible information of potential overpayments.

137.   Upon information and belief, PSA was not entitled to the monies it received from Medicare, Medicaid, and Tricare that were identified by the Relator in the credit balances AR Report and Unapplied Cash Report.

138.   Upon information and belief, after the overpayments were identified, PSA failed to use reasonable diligence in timely reporting and returning the overpayments and unapplied cash to the Government that it in fact had received.

Civil Action No.  4:16-CV-00102

139.   These overpayments are obligations in violation of the False Claims Act since they were knowingly concealed or knowingly and improperly avoided or decreased and not reported and returned to the Government within 60 days after identification.

140.   PSA intentionally, deliberately, or recklessly failed to timely take the necessary steps to investigate Relator's credible information of overpayments and unapplied cash that resulted in overbilling to Medicaid and Tricare.

141.   At all relevant times, Defendants knowingly concealed or avoided an obligation to pay money to the Government through their improper retention of overpayments.

## CLAIM NO. 2

### PSA failed to conduct supervisory visits in accordance with Georgia GAPP since August 2011, and in other state Medicaid programs, including but not limited to Colorado, Illinois, Louisiana, New Jersey, New York, North Carolina, Pennsylvania, and Virginia, since 2009

142.   Home Health Agencies such as PSA are required to schedule supervisory visits by a registered nurse to the home of a patient receiving home health services.  42 CFR § 484.36(2).  The purpose of the supervisory visit is to determine whether treatment goals are being met and assure that quality patient care is being rendered.

143.   State Medicaid laws such as Pennsylvania, Colorado, and Louisiana require that a registered nurse provide supervisory visits for certified home health

41

Civil Action No.  4:16-CV-00102

aides every 14 days.  *See* Pennsylvania: Home Health Agencies, Ch. 601, § 601.35 Home Health Aide Services; Colorado: Medicaid Benefit Coverage Standard, *Certified Nurse Aide Supervision*; Louisiana: Medicaid Services Manual, Home Health Provider Manual, Ch. 23, § 23.1 Description of Services, *Supervision of Home Health Aides*.

144.   Georgia requires a registered nurse to make a supervisory visit to the patient's residence at least once every 14 days.  A record of the supervisory visit must be dated and documented by an R.N. in a narrative note in the patient's clinical record.  "Any home health aide services rendered outside the supervisory period are not reimbursable and must not be billed to the Division."  *See* Georgia Department of Community Health, Policies & Procedures for Home Health Services, §§ 905.8 and 902.2, *Supervisory Assessments* and *Supervision of the Home Health Aide*.

145.  New Jersey and Virginia require that registered nurses conduct supervisory visits at least every 30 days.   New Jersey Division of Medical Assistance & Health Services, Home Care Services, N.J.A.C. 10:60, Ch. 60, 10:60-3.5, (a)(2) *Duties of the registered professional nurse*.

146.   Texas requires, "an RN must make a supervisory visit to the client's residence at least once every 60 days.  The supervisory visit must occur when the

Civil Action No.  4:16-CV-00102

HHA is providing care to the client." Texas Medicaid Provider Procedures Manual,

Vol. 2, Section 3.2.4.2 *Supervision of HHA*.

147.  TRICARE ECHO Home Healthcare contracts with PSA, dated 2008

(available in PSA's Internal Wiki.intranet) require that all home healthcare for

home health aides and licensed practical nurses must be under the direct

supervision of a registered nurse.

148.  Additionally, PSA's own policies outline the frequency of supervisory

visits:

  a.  *Private Duty skilled cases (non trach and vent):* every 60 days

  b.  *Private Duty skilled cases (trach and vent):* monthly/every 4-5 weeks by RN

  c.  *Intermittent Skilled Cases (LPN, PTA, COTA):* monthly/every 4-5 weeks by appropriate Professional (RN, PT, OT)

  d.  *Home Health Aide with skilled care:* Medicare: Every 2 weeks; Medicaid: according to state regulations

  e.  *Home Health Aide or Personal Care Services with no skill:* Medicare: every 30 days with aide present; Medicaid: every 30-60 days with aide present or according to state regulations

  f.  *Private Duty unskilled cases:* every 60 days

  g.  *Home Health Aide without skilled care:* every 60 days (each visit must occur when the aide is present)

  h.  *Homemaker/Companion/Live-In:* every 60 days
  i.  *PCP's, PCA's or similar level aides:* every 30-60 days (each visit must occur when the aide is present)

Civil Action No.  4:16-CV-00102

*See* Exhibit 7, PSA Clinical Operations Manual, Leadership and Management: Supervision.

149.   If claims were denied by the insurance carrier, Relator would review the account to ensure that all of the billing requirements had been fulfilled.  Relator would look at the patient's account in Encore and the itemized bills in the Encore system.

150.   In the Encore system the Relator could select the patient, the location, and the date range. A PDF report would populate depicting the services rendered grouped together by the claim number as they were billed to the insurance carrier, a detailed description of the services rendered, a running total of the charges billed to the insurance carrier, any payments received, total hours worked, and current outstanding balance on the account.

151.   Looking at these documents, which date back to approximately 2009, Relator was then able to evaluate if the appropriate nursing services were rendered and if there were any deficiencies as it related to the state's Medicaid requirements.

152.   Relator quickly realized that patients lacked RN supervisory visits in accordance with provider manual requirements for various states including, but not limited to Georgia, Colorado, Illinois, Louisiana, New Jersey, New York, North Carolina, Pennsylvania, and Virginia.

Civil Action No.  4:16-CV-00102

153.   As a representative sample, Relator identified approximately 42 patients in Georgia who were lacking nurse supervisory notes; four patients in Virginia; one patient in Pennsylvania; two in New York; seven in New Jersey; two in North Carolina; three in Louisiana; four in Colorado; and three in Illinois.

154.   The itemized statements for the representative samples lack the required service description for "RN SUPERVISORY VISIT PER HOUR".

155.   For example, patient 310826 is a Georgia GAPP Medicaid recipient who received nursing services from PSA from May 24, 2013—August 23, 2015. During that timeframe, PSA submitted 141 claims to Georgia Medicaid, and PSA was paid $302,702.40.  Over the course of 821 days, no RN supervisory visits were ever performed.  In fact, only one RN (not supervisory) visit was made on August 20, 2013.  *See* Exhibit 8, Redacted Itemized Statements for patient 310826, PAY001484—001550.

156.   The failure to conduct RN supervisory visits is in violation of Georgia Medicaid rules and regulations.

157. Although most state Medicaid programs do not provide reimbursement for RN supervisory visits, the state Medicaid programs should have received an itemized claim (billed at $0.00) to account for any RN supervisory visits performed.

Civil Action No. 4:16-CV-00102

158. Instead, as Exhibit 7 demonstrates, no "RN SUPERVISORY VISIT PER HOUR" was performed.

159. In August 2015, Relator advised her Team Lead, Samuel Blackman, that many patients were not receiving required supervisory visits. He did nothing.

160. On August 24, 2015 Relator met with her Manager, Merab Carty and advised her that PSA was not complying with Georgia and Louisiana nurse supervisory requirements. Carty responded "oh" in a surprised tone.

161. Carty then repeatedly told the Relator to "lay low" because Jim Knowles, Vice President of Revenue Cycle Management, wanted Carty to fire the Relator for raising various billing compliance issues.

162. In that same conversation Relator asked Carty why she thought PSA's management was on "pins and needles." Carty responded, "they know something is not right."

163. On September 1, 2015, Relator again advised Carty, "probably 70-80% of the accounts I look at have not had an RN visit on them in the 30 day interval. And some of these are million dollar accounts where the patient has not had but 1 or 2 RN visits."

164. Despite Relator repeatedly advising PSA management of their noncompliance with state Medicaid requirements PSA's management failed to take any corrective action.

Civil Action No.  4:16-CV-00102

165.   At all times relevant hereto, PSA presented or caused to be presented a false or fraudulent claim with the knowledge that the claim was false.

166.   At all times relevant hereto, PSA made a false record or statement for the purpose of getting paid or approved by the government, which caused the government to pay the false claim.

167.   At all times relevant hereto, PSA made a false or fraudulent claim or statement, knew the claim was false, and presented the claim for payment.

168.   PSA's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements made its representations misleading half-truths.

169.   At all times relevant hereto, PSA made a false or fraudulent claim or statement, knew the claim was false, was paid in reliance on the false record or statement.

## CLAIM NO. 3

### PSA's nursing notes do not meet documentation requirements for California, Colorado, Connecticut, Florida, Georgia, Illinois, Louisiana, Massachusetts, North Carolina, New Jersey, New York, Pennsylvania, Texas, Virginia, and Washington since at least 2009

170.   PSA provides nursing services including, but not limited to, assessment, teaching, injections, changing dressings, administering medications, catheter care, and skilled monitoring of symptoms. Home health aide services are of a personal care nature, are medically oriented, and include assistance in

47

Civil Action No.  4:16-CV-00102

activities of daily living and retaining self-help skills, for example, helping with bathing, helping with prescribed exercises, or assisting in ambulation.

171.   Almost all state Medicaid programs have minimum documentation requirements for clinical notes or visit summaries from each discipline, including but not limited to the treatments and services that were completed during the visit, the medication administered, vital signs, and the patient's status.  Additionally, the nursing notes must be signed.

172.   For example, in Georgia,

> The clinical record must include narrative progress notes detailing care provided to the member. **The notes should be written by all personnel for each service provided.** These narrative notes should include all information pertaining to the patient. Any problems reported by a patient or family must be addressed in these notes. **The notes should include on-going evaluations regarding the progress made with teaching plan.** Progress notes must be maintained on a continuous basis and should also include daily documentation of all treatments and medications administered by the nurse. Services should be performed and documented according to the physicians' orders and the Plan of Treatment.

Policies and Procedures for the Georgia Pediatric Program In-Home Skilled Nursing, Clinical Notes § 905.3, April 1, 2015.  (Emphasis added).

173.   Additionally, the Policies and Procedures for Medicaid/Peachcare for Kids require that healthcare providers, including PSA:

> **Maintain such written records for Medicaid/PeachCare for Kids members as necessary to disclose fully the extent of services provided and the medical necessity for the provision of such services**, for a minimum of six (6) years after the date of service.

Civil Action No.  4:16-CV-00102

> Active and recently active records must be maintained at the approved service location for review for a minimum of (2) two years after the last date of service... **Member records must, at a minimum, reflect the date of service, member name and medical history, the service provided, the diagnosis and the prescribed drugs or treatment ordered, and the original (not stamped) signature of the treating provider. The Department will accept secure electronic signatures as defined in the Definitions section of this Manual. Please refer to Part II for more stringent documentation and secure electronic signature requirements applicable to different categories of service.**

§ 106(R), General Conditions for Participation (Emphasis added).

174.   After pulling the daily AR Report and sorting her assigned claims, Relator's job duties required her to identify claims that had been denied by the insurance carrier.  In investigating why the claim may be denied, Relator would review the nursing notes on PSA's Intranet to see if they supported medical necessity requirements and to see if she could appeal the denial.

175.   Like the AR Report, "Nurse Check Notes Reports" are generated on a nightly basis and are available on PSA's Intranet and are accessible to all PSA Collectors. The Nurse Check Notes Reports have a 90-day look back period.

176.   Because many of the claims assigned to Relator were older than 90 days, she had to access older notes via PSA's "Image Freeway."

177.   On PSA's Intranet, Relator went to "Image Freeway" which took her to a searchable database for PSA documents including nursing notes, nurses' timesheets, plan of treatment, doctor's orders, authorizations, correspondence

Civil Action No.  4:16-CV-00102

received from an insurance carrier, and other medical documentation relating to the patient's account.  The documents within the Image Freeway date back to at least 2009.

178.   In reviewing the clients' nursing notes Relator expected to see a detailed description of the services rendered during each nurse's shift to the medically fragile child including an assessment, administering medications, catheter care, bathing, and skilled monitoring of symptoms.  However, in reality, many of the notes the Relator reviewed across multiple states were incomplete or lacked signatures (hardcopy or electronic).

179.   For example,

    a)   Nursing notes made by Wanda Mitchell on June 20, 22, and 24, 2015 only include the time she arrived and left.  On June 23 she simply noted, "report given to mom mo resuming care" after a 12 hour shift.

    b)   Nursing notes made by Vickie Spencer-Berry only include the time she arrived and left on June 21, 2015 after a 7 hour shift.  On June 23, 2015 she simply noted, "pt stable report give to mom in no distress" after an 8 hour shift.

    c)   On July 3, 2015, Sharon Ajede simply noted that the patient was stable after an almost 12 hour shift;

    d)   On July 3, 2015, Tommie Delap after an almost 12 hour shift simply noted he assumed the care of the client and gave a report to the next nurse;

Civil Action No.  4:16-CV-00102

> e) On July 5, 2015, Jewel Moore during an almost 12 hour shift simply arrived at the home of the patient and received a report from the leaving nurse.

*See* Exhibit 9 showing sample insufficient nursing notes (PAY000128; 000139; 000140).

180.   Additionally, pursuant to state Medicaid regulations all nursing notes must contain a signature.

181.   Almost 95% of the nursing notes Relator reviewed did not contain the required signatures.

182.   PSA's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements made its representations misleading half-truths.

183.   Despite these insufficient notes, PSA submitted claims for the purpose of getting paid or approved by the government, which caused the states' Medicaid and TRICARE programs to pay almost all of these nursing visits since 2009.

184.   The submission of claims with insufficient nursing notes constitutes a fraudulent claim, which was presented, or caused to be presented by PSA to Medicare, Medicaid, and Tricare for payment or approval.  At all times relevant hereto, PSA knew the claim was false.

185.   At all times relevant hereto, PSA made a false or fraudulent claim or statement, knew the claim was false, and presented the claim for payment.

Civil Action No.  4:16-CV-00102

186.   At all times relevant hereto, PSA made a false or fraudulent claim or statement, knew the claim was false, and was paid by Medicare, Medicaid, and Tricare in reliance on the false record or statement.

## CLAIM NO. 4

### PSA is missing nursing notes for the following states California, Colorado, Connecticut, Florida, Illinois, Louisiana, Massachusetts, North Carolina, New Jersey, New York, Pennsylvania, Texas, Virginia, and Washington from January 1, 2009 – August 1, 2015, and from Georgia since 2012

187.   After pulling the daily AR Report and sorting her assigned claims, Relator's job duties required her to identify claims that had been denied by the insurance carrier.  In investigating why the claim may be denied, Relator would review the nursing notes in PSA's Intranet to see if they supported medical necessity requirements for a possible appeal of the denial.

188.   The Shine program is the master scheduler for PSA.  It tracks nurses' schedules, nurses' notes, and a list of patients.  PSA's Intranet has a component called "Shine Missing Timesheets and Notes" (hereinafter "Shine Reports") which identifies and tracks all nursing notes that are missing from a patient's chart.

189.   Shine Reports include:

    a).   The patient's name;

    b).   The patient ID number;

    c).   The time of the shift/visit worked;

Civil Action No.  4:16-CV-00102

    d).    "Work status" ("yes" if the nurse worked the shift; "no" if the nurse did not work the shift);

    e).    "IVR ETS" which designates whether the nurse used the automated clocking system; and

    f.)    "NSG Notes" with a "No" under it means that the nurse did not complete and submit their notes for the shift.

190.  Like the AR Report and the Nurse Check Notes Reports, the Shine Reports are generated on a nightly basis and are available on PSA's Intranet and are accessible to all PSA Collectors for a 90-day look back period for all states.

191.  When Relator began working as a high dollar Collector she was given access to Shine Reports that had a look back period of approximately 6 years for all states.

192.  The Shine Reports pulled by Relator are dated January 1, 2009-August 11, 2015 and total 236 pages. Relator attaches a representative sample of missing nursing notes from California, Colorado, Connecticut, Florida, Georgia, Illinois, Louisiana, Massachusetts, North Carolina, New Jersey, New York, Pennsylvania, Texas, Virginia, and Washington at Exhibit 10, Shine Reports.

193.  After Relator pulled the Shine Report for a specific patient, Relator would cross-check "Imagine Freeway" to see if the notes were scanned into the system.

Civil Action No.  4:16-CV-00102

194.  If nursing notes were also missing in the Image Freeway system, Relator would contact the PSA servicing location for the patient to determine if the servicing location (Medicare/Medicaid enrolled provider site) had the notes in their possession.

195.  Every time the Relator called the servicing location, they were not in possession of the nursing notes either.

196.  Relator first advised her Team Lead, Samuel Blackman of this deficiency within the first week of working at PSA while on a conference call with the servicing location, Sam Blackman, and Carole Love (PSA Developmental Disability Program Manager).  Blackman and Love agreed that the nursing notes should be in Image Freeway, in Shine, or at the Medicaid enrolled provider site. However, they did nothing to further investigate Relator's concerns about the missing nursing notes.

197.  Pursuant to federal and state regulations PSA is required to create contemporaneous clinical notes reflecting the condition of the patient and the services provided that patient. *See* 42 CFR 484.36.

198.  Relator discovered that State Medicaid and Tricare programs paid PSA for services where there is no medical documentation showing that medical services were ever rendered.

Civil Action No.  4:16-CV-00102

199.  Not only was PSA not in compliance with maintaining records for alleged services rendered, there is no documentation to support that these paid claims were even medically necessary.

200.  Through the existence of the Shine Reports, PSA had direct knowledge of the missing nurse notes.  Despite the knowledge of the deficiencies identified in the Shine reports, PSA failed to determine whether the claimed (and billed for) nursing services had actually been rendered.

201.  Despite the substantial and material deficiencies in the Shine Reports, PSA billed Medicare and Medicaid for patients who lacked nursing notes and were grossly non-complaint with Medicare and Medicaid regulations.

202.  PSA's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements made its representations misleading half-truths.

203.  The submission of claims with missing nursing notes constitutes a fraudulent claim, which was presented, or caused to be presented by PSA to Medicare, Medicaid, and TRICARE for payment or approval.  At all times relevant hereto, PSA knew the claim was false.

204.  At all times relevant hereto, PSA made a false record or statement for the purpose of getting paid or approved by the government, which caused the government to pay the false claim.

Civil Action No. 4:16-CV-00102

205. At all times relevant hereto, PSA made a false or fraudulent claim or statement, knew the claim was false, and presented the claim for payment.

206. At all times relevant hereto, PSA made a false or fraudulent claim or statement, knew the claim was false, was paid in reliance on the false record or statement.

## CLAIM NO. 5

### PSA billed Medicare for denial only and then billed Medicaid for payment in full for rejected claims in California, Colorado, Connecticut, Georgia, Louisiana, Massachusetts, New Jersey, North Carolina, Pennsylvania, Texas, Virginia, and Washington since at least March 1, 2014

207. Private duty nursing is defined in the Code of Federal Regulations as:

Private duty nursing services means nursing services for beneficiaries who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility. These services are provided—

(a) By a registered nurse or a licensed practical nurse;
(b) Under the direction of the beneficiary's physician; and
(c) To a beneficiary in one or more of the following locations at the option of the State—

(1) His or her own home;
(2) A hospital; or
(3) A skilled nursing facility.

42 CFR § 440.80.

208. Medicare does not pay for the services of a private duty nurse or attendant. *See* 42 CFR § 409.21(b).

Civil Action No.  4:16-CV-00102

209.   Medicare does pay for skilled nursing services *if* the home health agency has a valid agreement to participate in the Medicare program and the patient has met the following criteria as outlined in 42 CFR § 424.22, Requirements for Home Health Services which provide as follows:

> Medicare Part A or Part B pays for home health services only if a physician certifies and recertifies the content specified in paragraphs (a)(1) and (b)(2) of this section, as appropriate.
>
> (a) Certification—
>
> (1) Content of certification. As a condition for payment of home health services under Medicare Part A or Medicare Part B, a physician must certify the patient's eligibility for the home health benefit, as outlined in sections 1814(a)(2)(C) and 1835(a)(2)(A) of the Act, as follows in paragraphs (a)(1)(i) through (v) of this section. The patient's medical record, as specified in paragraph (c) of this section, must support the certification of eligibility as outlined in paragraph (a)(1)(i) through (v) of this section.
>
> > (i) The individual needs or needed intermittent skilled nursing care, or physical therapy or speech-language pathology services as defined in § 409.42(c) of this chapter. If a patient's underlying condition or complication requires a registered nurse to ensure that essential non-skilled care is achieving its purpose, and necessitates a registered nurse be involved in the development, management, and evaluation of a patient's care plan, the physician will include a brief narrative describing the clinical justification of this need. If the narrative is part of the certification form, then the narrative must be located immediately prior to the physician's signature. If the narrative exists as an addendum to the certification form, in addition to the physician's signature on the certification form, the physician must sign immediately following the narrative in the addendum.
> >
> > (ii) Home health services are or were required because the individual is or was confined to the home, as defined in sections

Civil Action No.  4:16-CV-00102

1835(a) and 1814(a) of the Act, except when receiving outpatient services.

(iii) A plan for furnishing the services has been established and will be or was periodically reviewed by a physician who is a doctor of medicine, osteopathy, or podiatric medicine, and who is not precluded from performing this function under paragraph (d) of this section. (A doctor of podiatric medicine may perform only plan of treatment functions that are consistent with the functions he or she is authorized to perform under State law.)

(iv) The services will be or were furnished while the individual was under the care of a physician who is a doctor of medicine, osteopathy, or podiatric medicine.

(v) A face-to-face patient encounter, which is related to the primary reason the patient requires home health services, occurred no more than 90 days prior to the home health start of care date or within 30 days of the start of the home health care and was performed by a physician or allowed non-physician practitioner as defined in paragraph (a)(1)(v)(A) of this section. The certifying physician must also document the date of the encounter as part of the certification.

(A) The face-to-face encounter must be performed by one of the following:

(1) The certifying physician himself or herself.

(2) A physician, with privileges, who cared for the patient in an acute or post-acute care facility from which the patient was directly admitted to home health.

(3) A nurse practitioner or a clinical nurse specialist (as those terms are defined in section 1861(aa)(5) of the Act) who is working in accordance with State law and in collaboration with the certifying physician or in collaboration with an acute or post-acute care physician with privileges who cared for the patient in the acute or

Civil Action No.  4:16-CV-00102

post-acute care facility from which the patient was directly admitted to home health.

(4) A certified nurse midwife …

(5) A physician assistant…

(B) The face-to-face patient encounter may occur through telehealth, in compliance with section 1834(m) of the Act and subject to the list of payable Medicare telehealth services established by the applicable physician fee schedule regulation.

(2) Timing and signature. The certification of need for home health services must be obtained at the time the plan of care is established or as soon thereafter as possible and must be signed and dated by the physician who establishes the plan.

(b) Recertification—

(1) Timing and signature of recertification. Recertification is required at least every 60 days when there is a need for continuous home health care after an initial 60–day episode. Recertification should occur at the time the plan of care is reviewed, and must be signed and dated by the physician who reviews the plan of care. Recertification is required at least every 60 days unless there is a—

(i) Beneficiary elected transfer; or

(ii) Discharge with goals met and/or no expectation of a return to home health care.

(2) Content and basis of recertification. The recertification statement must indicate the continuing need for services and estimate how much longer the services will be required. Need for occupational therapy may be the basis for continuing services that were initiated because the individual needed skilled nursing care or physical therapy or speech therapy. If a patient's underlying condition or complication requires a registered nurse to ensure that essential non-skilled care is achieving its purpose, and necessitates a registered nurse be

Civil Action No.  4:16-CV-00102

> involved in the development, management, and evaluation of a patient's care plan, the physician will include a brief narrative describing the clinical justification of this need. If the narrative is part of the recertification form, then the narrative must be located immediately prior to the physician's signature. If the narrative exists as an addendum to the recertification form, in addition to the physician's signature on the recertification form, the physician must sign immediately following the narrative in the addendum.

42 CFR § 424.22(a), (b).

210.   PSA did not have a valid agreement to participate in the Medicare program in several states, including Georgia as is discussed in more detail in Claim 7 below.

211.   After pulling the daily AR Report and sorting her assigned claims, Relator's job duties required her to identify claims that had been denied or rejected by the insurance carrier.

212.   To investigate these denials and rejections Relator needed access to PSA's EASE program.  EASE is a software system used to access the Medicare DDE system in which claims are processed by Medicare.  This privilege was granted to Relator by her Manager, Merab Carty initially for Georgia and then for all states when she became a high dollar collector.[4]

---

[4] Before receiving access to the EASE/Medicare DDE System, Relator requested the patient's Medicare Explanation of Benefits (EOB) from Elaine Thompson, Special Projects Team Lead, Shared Services.

Civil Action No.  4:16-CV-00102

213.   The EASE/Medicare DDE system allows users to export a claim status report to an Excel document.  Relator is in possession of an 18-month look back of all claims submitted to Medicare for reimbursement for service locations in California, Colorado, Connecticut, Georgia, Louisiana, Massachusetts, New Jersey, North Carolina, Pennsylvania, Texas, Virginia, and Washington.[5]   *See* Exhibit 11, EASE Report at PAY020345—020363.

214.  Once inside the EASE/Medicare DDE system, Relator saw that Medicare had rejected over 793 claims submitted by PSA for an 18-month look back period for the following states: California, Colorado, Connecticut, Georgia, Louisiana, Massachusetts, New Jersey, North Carolina, Pennsylvania, Texas, Virginia, and Washington. The 18-month look back period Relator was able to access was from approximately March 1, 2014—September 1, 2015.[6]   *See* Exhibit 11.

215.   Relator exported the Excel spreadsheet and converted it into a pivot table and sorted by status location ("S-Location") which provides the status of the claim as it was considered by Medicare. *See* EASE Pivot table attached hereto as Exhibit 12, PAY020345-1—PAY020345-2.

---

[5] Relator will deliver the unredacted EASE report (PAY020345—020363) to PSA contemporaneously with the filing of this Amended Complaint.

[6] Discovery will likely reveal many other similar Medicare rejections for a longer time span.

Civil Action No.  4:16-CV-00102

216.   Below the pivot table Relator has provided the CMS key depicting what each of the "S-Locations" represent.

217.   According to the CMS's Home Health & Hospice FISS Overview Manual, a "rejected claim status" results when a billing transaction is rejected for reasons such as (i) Medicare eligibility; (ii) billing issues; or (iii) it is a duplicate to a previously submitted claim.   *See* FISS Overview, Home Health & Hospice, Chapter 1, pg. 13.

218.   Whereas, a "denied claim status" results when the claim was submitted as a demand denial, or was denied by medical review, or due to ordering/referring physician edits.   *Id.*

219.   The pivot table at Exhibit 12 illustrates that Medicare rejected $1,339,779.49 in claims submitted by PSA.

220.   Once Relator realized that Medicare had rejected at least 793 claims, she looked to see what had happened to them and quickly discovered that Medicaid had paid out on the claims rejected by Medicare.

221.   Medicaid is a payor of last resort and PSA is required to ascertain the legal liability of third parties legally responsible for payment of a health care service before billing Medicaid.   *See* 42 USC § 1396a(a)(25).

222.   Relator then discovered that PSA was submitting bills for **private duty nursing** to Medicare for denial only on a CMS 1450 UB-04 Form ("UB-04

Civil Action No.  4:16-CV-00102

Form").  In other words, PSA was asking Medicare to deny the claim as "non-covered" for private duty nursing.

223.  PSA did not receive a "denial" that Medicare had considered the charges for reimbursement. Instead PSA received a "rejection" from Medicare—meaning Medicare never considered the charges for reimbursement.  *See* Exhibit 11, EASE Report, and Exhibit 12, Pivot table.

224.  Upon information and belief, Medicare rejected the claim because PSA was not Medicare certified/eligible.

225.  PSA would then take the Medicare rejection and change the claim form from the UB-O4 sent to Medicare to a CMS-1500 form to the state's Medicaid program.

226.  Even though PSA billed Medicare for **private duty nursing**, PSA billed Medicaid for **skilled nursing** using a procedure code of S9124 or S9123. *See* Exhibit 13, at PAY020422—020426.

227.  At all times relevant hereto, PSA billed Medicaid for services that Medicare had not considered.

228.  Several of PSA's clients were Medicare (primary) and Medicaid (secondary), including PSA patient 313931.

229.  However, PSA submitted the form 1500 form to Georgia Medicaid for patient 313931 without selecting that she had Medicare.  *See* Exhibit 13.

Civil Action No.  4:16-CV-00102

[PAY020422—020426].   From January 6, 2015 through August 17, 2015, PSA submitted 35 claims to Georgia Medicaid even though the patient had Medicare primary.  Georgia Medicaid paid $41,225.75 on these 35 claims.  *See* Exhibit 14, PAY000677—PAY000688; *see also* EASE Report at Exhibit 10.

230.   On October 20, 2015, Relator emailed a Program Specialist at Georgia Pediatric Program who confirmed that Medicaid is a payor of last resort, "and if the member has Medicare as primary then they have to be billed first.  If you are going to bill Medicaid for any services, you must have the actual denial from Medicare (which means you have to be a Medicare provider as well as a Medicaid provider)."  *See* Exhibit 15, at PAY020419.

231.   The 1500 form submitted to Georgia Medicaid frequently contained Jim Kanelos name in section 31 for "signature of physician or supplier including degrees or credentials." *See* Exhibit 13.

232.   Jim Kanelos served as PSA's Vice President of Revenue Cycle Management from June 2014—May 2016 and upon information and belief has no medical training.

233.   Relator was able to determine based upon the rejections identified from the EASE Report and reviewing the patient's accounts that claims had never been properly considered by Medicare and payments were showing posted to the patient's account and paid by Medicaid.

Civil Action No.  4:16-CV-00102

234.   Additionally, Relator identified 29 patients in Massachusetts who had Medicare primary and Medicaid secondary.  PSA submitted bills for denial only to Medicare and after receiving the rejections billed the Massachusetts state Medicaid program which paid more than $11.7 million in claims.  *See* Exhibit 16, Chart created by Relator identifying Massachusetts patients who were Medicare eligible but PSA improperly billed Medicare in order to be paid by Medicaid.[7]

235.  On October 7, 2015, Relator attended a meeting with PSA Management including Merab Carty (Relator's Manager); Debbie Lewis (Vice President, Operations Development); Jim Kanelos; Carole Love (PSA Developmental Disability Program Manager); Elaine Thompson (Special Projects Team Lead); Cristy Carey (Location Director Atlanta); and others wherein she outlined PSA's improper billing practice of billing Medicare for denial only.

236.  Carty offered an explanation for the improper practice stating that maybe PSA is billing Medicare Part B, but then added that PSA is not Part B certified.

237.  During this meeting Elaine Thompson stated that it is her (albeit incorrect) understanding that a "rejection" from Medicare is the same thing as a "denial."

---

[7]  Relator will deliver an unredacted version of Exhibit 16 to   PSA contemporaneously with the filing of this Amended Complaint.

Civil Action No.  4:16-CV-00102

238.   Relator emailed Debbie Lewis a copy of the EASE Report on October 13, 2015.  *See* Exhibit 11, at PAY020344.  Relator also sent the EASE Report to Patrick Cunningham, PSA's Chief Compliance Officer on October 15, 2015.  *See* Exhibit 3.

239.   At all times relevant hereto, PSA submitted claims to Medicare and/or Medicaid which misrepresented the services that it provided.

240.   PSA presented or caused to be presented a false claim to Medicare and Medicaid with knowledge that the claim was false.

241.   PSA's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements made its representations misleading half-truths.

242.   PSA presented or caused to be presented a false claim to Medicare and Medicaid with knowledge that the claim was false.

243.   PSA made a false record or statement for the purpose of getting a false claim paid or approved by the government, and PSA's false record or statement caused the government, in this instance, Medicaid to actually pay a false claim.

244.   At all times material hereto, PSA knew the claim or statement was false when it presented the claim for payment.

Civil Action No.  4:16-CV-00102

245.   At all times material hereto, PSA knew the claim or statement was false and was paid by Medicaid in reliance of the false record or statement.

## CLAIM NO. 6

### PSA received denial authorizations from commercial insurance companies for one procedure code and billed Medicaid for payment in full for other procedure codes not considered by the commercial insurance company in states including but not limited to Connecticut, Florida, Georgia, Massachusetts, North Carolina, New Jersey, Pennsylvania, Texas, Virginia, and Washington

246.   Where Medicaid is secondary and a commercial or private insurance company is primary, PSA has to obtain an authorization from the commercial carrier to determine what charges the primary insurance company will pay.

247.   Relator learned that PSA used only one billing code for one (inaccurate) level of care in obtaining an authorization from the commercial insurance company.

248.   After receipt of the "coverage denial" or "coverage decision for denied services" from the commercial payor, PSA presented the correspondence to the state Medicaid program advising that the commercial insurance denied the authorization for the services, along with a claim purporting to be for services covered by the denial, but which were neither submitted to the commercial payor nor considered by them for payment.

249.   For example, after submitting a bill to a commercial insurance payor for general nursing care and receiving a denied authorization from the commercial

Civil Action No.  4:16-CV-00102

payor, PSA then submitted fraudulent claims to Texas Medicaid based upon the commercial payor's denial when they knew or should have known that Texas Medicaid excluded respite care.  *See* Exhibit 17 at PAY000182—000188; Texas Medicaid Provider Procedures Manual, Provider Manual, Vol. 2, Dec. 2013.

250.  On multiple occasions Medicaid paid for a level of care not considered by the primary commercial insurance and paid for services which had been excluded from consideration.

251.  At all relevant times, PSA knew that it had not submitted the appropriate procedure code and service description to the commercial payors.

252.  Furthermore PSA did not appeal or supply medical necessity documentation to any of the denials from commercial payors or appeal the denials prior to their submission of claims to Medicaid for payment.

253.  The correspondence with the insurance carrier and the bills submitted to the State Medicaid programs are located on PSA's Intranet by utilizing Information Freeway.

254.  Relator reviewed correspondence from the commercial payors and the patients billing records going back to at least March 2011.

255.  The state Medicaid programs that paid for services that were not considered by the primary insurance carrier include Connecticut, Florida, Georgia,

Civil Action No.  4:16-CV-00102

Massachusetts, North Carolina, New Jersey, Pennsylvania, Texas, Virginia, and Washington.  However, discovery may reveal other states.

256.   At all times relevant hereto, PSA submitted claims to the Government which misrepresented the services that it provided and which had not been considered by the primary (commercial) payor.

257.  PSA presented or caused to be presented a false claim to the Government with knowledge that the claim was false.

258.  PSA's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements made its representations misleading half-truths.

259.  PSA presented or caused to be presented a false claim to the Government with knowledge that the claim was false.

260.  PSA made a false record or statement for the purpose of getting a false claim paid or approved by the government, and PSA's false record or statement caused the government, in this instance, Medicaid to actually pay a false claim.

261.   At all times material hereto, PSA knew the claim or statement was false and presented the claim for payment.

262.   At all times material hereto, PSA knew the claim or statement was false and was paid by Medicaid in reliance of the false record or statement.

Civil Action No.  4:16-CV-00102

# CLAIM NO. 7

**PSA failed to comply with state and federal rules and regulations for participation in state Medicaid programs including but not limited to, Colorado, Georgia, Louisiana, Massachusetts, New Jersey, Pennsylvania, South Carolina, and Texas and any claims submitted to the respective state Medicaid programs constitute a false claim**

263.   In order to receive Medicaid funding, states such Colorado, Georgia, Louisiana, Massachusetts, New Jersey, Pennsylvania, South Carolina, and Texas require that a home health care agency have an agreement with Medicare and/or be certified with Medicare in order to be entitled to participate in the state Medicaid plan.

264.   For example, in Colorado:

Home Health agencies must be licensed by the State of Colorado as a class A home care agency in good standing, **must be Medicare and Medicaid certified**, and determined to comply with the Medicare conditions of participation for HHAs as specified by Title 42 C.F.R., Part 440.70. The HHA shall:

1. **Meet the Home Health Medicare conditions of participation as determined through a survey conducted by the Colorado Department of Public Health and Environment; and**
2. **Be actively enrolled as a Medicare and Medicaid Home Health provider;**
3. May also choose to be accredited or have deemed status by the Joint Commission (JC), Community Health Accreditation Program (CHAP) or the Accreditation Commission for Health Care, Inc. (ACHC).

Colorado Medicaid Benefit Coverage Standard, Agency Requirements, pg. 2 (Emphasis added).

Civil Action No.  4:16-CV-00102

265.   Similarly, in Louisiana,

**To participate in the Home Health Program the providing agency must be Medicare-certified for Medicare/Medicaid by the Licensing and Certification Unit of the Health Standards Section of the Louisiana Medicaid Bureau of Health Services Financing (BHSF). All providers enrolled in the Louisiana Medicaid Program must adhere to the conditions of participation as outlined in the provider agreement.** All home health services must be provided by staff employed by or under contract with the home health agency (HHA) (see LAC 48, Chapter 91). (Also refer to 42 CFR 417.416 and Sec 2194 of the State Operations Manual CMS Pub. 7 for specific requirements). All staff must meet all required licensure requirements in accordance with Medicaid policies, federal, state and other applicable laws.

Louisiana Medicaid Program, Chapter 23: Home Health, Section 23.4, Provider Requirements.  *See also* New Jersey Division of Medical Assistance and Health Services, Home Care Services Manual (requiring the home health agency to be "certified as a home health agency under Title XVIII (Medicare) Program"); South Carolina Home Health Services Provider Manual, Section 2, Program Requirements, Licensure and Certification ("The home health agency must be certified to participate under Title XVIII (Medicare)…").

266.   According to Medicare's www.data.medicare.gov website, PSA is not Medicare certified in Colorado, Louisiana, Massachusetts, New Jersey, South Carolina, or Texas.

267.   Upon information and belief, PSA is no longer certified with Medicare in Pennsylvania, Georgia, Illinois, or Connecticut.

Civil Action No.  4:16-CV-00102

268.   While working as an AR Collector, Relator discovered a letter from CMS on PSA's Intranet to PSA's Vice President of Operations, Kristy Maddox, which states in part,

> **since your home health agency does not have a valid agreement to participate in the Medicare program, services provided by your agency would not be covered by Medicare.**

*See* Exhibit 18, Letter from CMS to PSA's Vice President of Operations, Kristy Maddox dated March 19, 2014.

269.   Additionally, in order for PSA to receive any payments from Medicare and Medicaid in the state of Georgia, PSA was required to have a Certificate of Need from the Georgia Department of Community Health. However, PSA was unable to obtain a Certificate of Need because it was not Medicare certified.  Thus, PSA should have never billed Georgia Medicaid because it did not meet the requirements for a Certificate of Need and thus was not entitled to receive monies from government payors.

270.   On August 19, 2015, Relator began telling Debbie Lewis Vice President, Operations Development about the March 19, 2014 letter from CMS but was interrupted when Lewis received a personal phone call.

271.   On August 21, 2015, Relator emailed the letter from CMS (Exhibit 18) to her Team Lead, Samuel Blackman and Manager, Merab Carty.  Neither Blackman nor McCarty responded to Relator by email.

Civil Action No.  4:16-CV-00102

272.   However, in a conversation with Relator on August 21, 2015, Blackman said, "If we're not credentialed, we shouldn't even be billing if we're not credentialed…We had the same problem in Sacramento, California…We're trying to get Medicare certified somewhere—."

273.   Since PSA did not comply with the rules and regulations of participation in the state Medicaid programs in Colorado, Georgia, Louisiana, New Jersey, Pennsylvania, South Carolina, and Texas, then PSA was not entitled to any reimbursement by those state Medicaid programs.

274.   Thus, any claims submitted by PSA to Colorado, Georgia, Louisiana, Massachusetts, New Jersey, Pennsylvania, South Carolina, and Texas' state Medicaid programs (in addition to those to be identified in discovery) were fraudulent claims as they were ineligible for any reimbursement since approximately January 2011, and upon information and belief the time frame may be even longer.

275.   PSA presented or caused to be presented a false claim to Medicaid and Tricare with knowledge that the claim was false.

276.   PSA's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements including that it was not Medicare certified, made its representations misleading half-truths.

Civil Action No.  4:16-CV-00102

277.   PSA presented or caused to be presented a false claim to Medicaid with knowledge that the claim was false.

278.   PSA made a false record or statement for the purpose of getting a false claim paid or approved by the government, and PSA's false record or statement caused the government, in this instance, Medicaid to actually pay a false claim.

279.   At all times material hereto, PSA knew the claim or statement was false and presented the claim for payment.

280.   At all times material hereto, PSA knew the claim or statement was false and was paid by Medicaid in reliance of the false record or statement.

## **COUNT I**

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

281.   Plaintiff realleges and incorporates by reference paragraph "1" through "280" as though fully set forth herein.

282.   This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

283.   The Plaintiff/Relator has standing to maintain this action by virtue of 31 U.S.C. § 3730(b).

Civil Action No.  4:16-CV-00102

284.   By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1), as amended.

285.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the Government since the inception of the scheme described herein.

286.   The United States paid the false claims described herein.

287.   By virtue of the false claims presented or caused to by Defendants, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damages, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.  Violations that occurred on or before November 2, 2015 and assessments made before August 1, 2016 (whose associated violations occurred after November 2, 2015) are assessed at $11,000 to $21,563 per penalty.

## COUNT II

Claim  By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

Civil Action No.  4:16-CV-00102

288.   Plaintiff realleges and incorporates by reference paragraph "1" through "280" as though fully set forth herein.

289.   This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

290.   The Plaintiff/Relator has standing to maintain this action by virtue of 31 U.S.C. § 3730(b).

291.   By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the Government, Defendants caused to be made or used false records or statements to get false or fraudulent claims paid or approved by an agency of the United States Government, in violation of 31 U.S.C. § 3729(a)(2).

292.   Defendants made false certifications regarding past and present compliance with a prerequisite for payment or reimbursement by the United States through Medicare, Medicaid, or Tricare when Defendants were aware that its practices described herein were in violation of Medicare, Medicaid, and Tricare rules and regulations.

293.   The false records or statements were material to the false claims submitted or caused to be submitted by Defendant to the United States.

Civil Action No.  4:16-CV-00102

294.   In reliance upon Defendant's false statements and records, the United States paid false claims submitted by Defendants that it would not have paid if not for those false statements and records.

295.   The United States paid the false claims described herein.

296.   By virtue of, and as a result of, the false records and statements used to get false claims paid by the Government, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,000 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.  Violations that occurred on or before November 2, 2015 and assessments made before August 1, 2016 (whose associated violations occurred after November 2, 2015) are assessed at $11,000 to $21,563 per penalty.

## COUNT III

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

297.   Plaintiff realleges and incorporates by reference paragraph "1" through "141" as though fully set forth herein.

298.   This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

Civil Action No.  4:16-CV-00102

299.   The Plaintiff/Relator has standing to maintain this action by virtue of 31 U.S.C. § 3730(a).

300.   By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, a false records or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

     a.   Defendants knew they had received hundreds of thousands of dollars in credit balances which constituted overpayments, yet Defendants took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds;

     b.   Defendants knew that they were in violation of the terms of their CIA, yet if failed to disclose such violations as required by the CIA or refund any overpayments premised upon its certifications of compliance, and instead continued to bill the United States.

301.   As a result of fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

302.   Relator demands judgment in her favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31

Civil Action No.  4:16-CV-00102

U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.  Violations that occurred on or before November 2, 2015 and assessments made before August 1, 2016 (whose associated violations occurred after November 2, 2015) are assessed at $11,000 to $21,563 per penalty.

## COUNT IV

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

303.  Plaintiff realleges and incorporates by reference paragraph "1" through "280" as though fully set forth herein.

304.  This is a claim under the Georgia State False Medicaid Claims Act, Georgia Code § 49-4-168.1, *et seq*.

305.  The Plaintiff/Relator has standing to maintain this action by virtue of the Georgia State False Medicaid Claims Act, Georgia Code § 49-4-168.1, *et seq*.

306.  By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of Georgia in violation of the Georgia State False Medicaid Claims Act.

Civil Action No. 4:16-CV-00102

307. The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of Georgia since the inception of the scheme described herein.

308. By virtue of the false claims presented or caused to be presented by Defendants, the State of Georgia has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT V

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

309. Plaintiff realleges and incorporates by reference paragraph "1" through "280" as though fully set forth herein.

310. This is a claim under the Georgia State False Medicaid Claims Act, Georgia Code § 49-4-168.1, *et seq*.

311. The Plaintiff/Relator has standing to maintain this action by virtue of the Georgia State False Medicaid Claims Act, Georgia Code § 49-4-168.1, *et seq*.

312. By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of Georgia, Defendants caused to

80

Civil Action No.  4:16-CV-00102

be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of Georgia, in violation of the Georgia State False Medicaid Claims Act.

313.   By virtue of, and as a result of, the false records and statements used to get false claims by the State of Georgia, the State of Georgia suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## **COUNT VI**

Claim  By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

314.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 and paragraphs 170 through 245 as though fully set forth herein.

315.   This is a claim under the California False Claims Act, (Gov. Code § 12650, *et seq*.).

316.   The Plaintiff/Relator has standing to maintain this action by virtue of the California False Claims Act (Gov. Code § 12650, *et seq*.).

317.   By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for

Civil Action No.  4:16-CV-00102

payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of California in violation of the California False Claims Act.

318.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of California since the inception of the scheme described herein.

319.   By virtue of the false claims presented or caused to be presented by Defendants, the State of California has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT VII

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

320.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 and paragraphs 170 through 245 as though fully set forth herein.

321.   This is a claim under the California False Claims Act (Gov. Code § 12650, *et seq*.).

322.   The Plaintiff/Relator has standing to maintain this action by virtue of the California False Claims Act (Gov. Code § 12650, *et seq*.).

Civil Action No.  4:16-CV-00102

323.  By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of California, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of California, in violation of the California False Claims Act.

324.  By virtue of, and as a result of, the false records and statements used to get false claims by the State of California, the State of California suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## **COUNT VIII**

Claim  By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

325.  Plaintiff realleges and incorporates by reference paragraphs 1 through 245 and paragraphs 263 through 280 as though fully set forth herein.

326.  This is a claim under the Colorado Medicaid False Claims Act, (Colo. Rev. State. 25.5-4-303.5, *et seq*.).

Civil Action No.  4:16-CV-00102

327.   The Plaintiff/Relator has standing to maintain this action by virtue of the Colorado Medicaid False Claims Act (Colo. Rev. State. 25.5-4-303.5, *et seq*.).

328.   By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of Colorado in violation of the Colorado Medicaid False Claims Act.

329.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of Colorado since the inception of the scheme described herein.

330.   By virtue of the false claims presented or caused to be presented by Defendants, the State of Colorado has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,000 and not more than $10,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## **COUNT IX**

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

331.   Plaintiff realleges and incorporates by reference paragraphs 1 through 245 and paragraphs 263 through 280 as though fully set forth herein.

Civil Action No.  4:16-CV-00102

332.   This is a claim under the Colorado Medicaid False Claims Act (Colo. Rev. State. 25.5-4-303.5, *et seq.*).

333.   The Plaintiff/Relator has standing to maintain this action by virtue of the Colorado Medicaid False Claims Act (Colo. Rev. State. 25.5-4-303.5, *et seq.*).

334.   By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of Colorado, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of Colorado, in violation of the Colorado Medicaid False Claims Act.

335.   By virtue of, and as a result of, the false records and statements used to get false claims by the State of Colorado, the State of Colorado suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,000 and not more than $10,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT X

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

Civil Action No.  4:16-CV-00102

336.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 and paragraphs 170 through 280 as though fully set forth herein.

337.   This is a claim under the Connecticut False Claims Act for Medical Assistance Programs (Conn. Gen. Stat. § 17b-301(a), *et seq*.)

338.   The Plaintiff/Relator has standing to maintain this action by virtue of the Connecticut False Claims Act for Medical Assistance Programs (Conn. Gen. Stat. § 17b-301(a), *et seq*.)

339.   By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of Connecticut in violation of the Connecticut False Claims Act for Medical Assistance Programs.

340.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of Connecticut since the inception of the scheme described herein.

341.   By virtue of the false claims presented or caused to be presented by Defendants, the State of Connecticut has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,000 and not more than $10,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

Civil Action No.  4:16-CV-00102

## COUNT XI

Claim  By and on  Behalf of the  United States  under  the  False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

342.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 and paragraphs 170 through 280 as though fully set forth herein.

343.   This is a claim under the Connecticut False Claims Act for Medical Assistance Programs (Conn. Gen. Stat. § 17b-301(a), *et seq*.).

344.   The Plaintiff/Relator has standing to maintain this action by virtue of the Connecticut False Claims Act for Medical Assistance Programs (Conn. Gen. Stat. § 17b-301(a), *et seq*.).

345.   By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of Connecticut, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of Connecticut, in violation of the Connecticut False Claims Act for Medical Assistance Programs.

346.   By virtue of, and as a result of, the false records and statements used to get false claims by the State of Connecticut, the State of Connecticut suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,000 and not more than

Civil Action No.  4:16-CV-00102

$10,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT XII

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

347.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 and paragraphs 170 through 206 and paragraphs 246-262 as though fully set forth herein.

348.   This is a claim under the Florida False Claims Act, (Fla. Stat. Ann § 68.081, *et seq.*

349.   The Plaintiff/Relator has standing to maintain this action by virtue of the Florida False Claims Act, (Fla. Stat. Ann § 68.081, *et seq.*).

350.   By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of Florida in violation of the Florida False Claims Act.

351.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of Florida since the inception of the scheme described herein.

Civil Action No.  4:16-CV-00102

352.   By virtue of the false claims presented or caused to be presented by Defendants, the State of Florida has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT XIII

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

353.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 and paragraphs 170 through 206 and paragraphs 246-262 as though fully set forth herein.

354.   This is a claim under the Florida False Claims Act (Fla. Stat. Ann § 68.081, *et seq*.).

355.   The Plaintiff/Relator has standing to maintain this action by virtue of the Florida False Claims Act (Fla. Stat. Ann § 68.081, *et seq*.).

356.   By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of Florida, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid

Civil Action No.  4:16-CV-00102

or approved by an agency of the State of Florida, in violation of the Florida False Claims Act.

357.   By virtue of, and as a result of, the false records and statements used to get false claims by the State of Florida, the State of Florida suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## **COUNT XIV**

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

358.   Plaintiff realleges and incorporates by reference paragraphs 1 through 206 as though fully set forth herein.

359.   This is a claim under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq*.

360.   The Plaintiff/Relator has standing to maintain this action by virtue of the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq*.

361.   By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment or knowingly caused false or fraudulent claims for payment to be

Civil Action No.  4:16-CV-00102

presented, to officials to the State of Illinois in violation of the Illinois Whistleblower Reward and Protection Act.

362.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of Illinois since the inception of the scheme described herein.

363.   By virtue of the false claims presented or caused to be presented by Defendants, the State of Illinois has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,000 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## <u>COUNT XV</u>

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

364.   Plaintiff realleges and incorporates by reference paragraphs 1 through 206 as though fully set forth herein.

365.   This is a claim under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq*.

366.   The Plaintiff/Relator has standing to maintain this action by virtue of the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq*.

Civil Action No.  4:16-CV-00102

367.  By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of Illinois, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of Illinois, in violation of the Illinois Whistleblower Reward and Protection Act.

368.  By virtue of, and as a result of, the false records and statements used to get false claims by the State Illinois, the State of Illinois suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,000 and not more than $10,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## **COUNT XVI**

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

369.  Plaintiff realleges and incorporates by reference paragraphs 1 through 245 and paragraphs 263 through 280 as though fully set forth herein.

370.  This is a claim under the Louisiana False Claims Act/Medical Assistance Programs Integrity Law (LSA R.S. 46.437.1, *et seq.*).

Civil Action No. 4:16-CV-00102

371. The Plaintiff/Relator has standing to maintain this action by virtue of the Louisiana False Claims Act/Medical Assistance Programs Integrity (LSA R.S. 46.437.1, *et seq.*).

372. By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of Louisiana in violation of the Louisiana False Claims Act/Medical Assistance Programs Integrity Law.

373. The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of Louisiana since the inception of the scheme described herein.

374. By virtue of the false claims presented or caused to be presented by Defendants, the State of Louisiana has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties not to exceed $10,000 of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT XVII

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

Civil Action No.  4:16-CV-00102

375.   Plaintiff realleges and incorporates by reference paragraphs 1 through 245 and paragraphs 263 through 280 as though fully set forth herein.

376.  This is a claim under the Louisiana False Claims Act/Medical Assistance Programs Integrity Law (LSA R.S. 46.437.1, *et seq.*).

377.   The Plaintiff/Relator has standing to maintain this action by virtue of the Louisiana False Claims Act/Medical Assistance Programs Integrity Law (LSA R.S. 46.437.1, *et seq.*).

378.   By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of Louisiana, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of Louisiana, in violation of the Louisiana False Claims Act/Medical Assistance Programs Integrity Law.

379.   By virtue of, and as a result of, the false records and statements used to get false claims by the State of Louisiana, the State of Louisiana suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties not to exceed $10,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

Civil Action No.  4:16-CV-00102

## COUNT XVIII

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

380.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 and paragraphs 170 through 280 as though fully set forth herein.

381.   This is a claim under the Massachusetts False Claims Act, (Mass. Gen. Laws § 5A, *et seq*.).

382.   The Plaintiff/Relator has standing to maintain this action by virtue of the Massachusetts False Claims Act, (Mass. Gen. Laws § 5A, *et seq*.).

383.   By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of Massachusetts in violation of the Massachusetts False Claims Act.

384.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of Massachusetts since the inception of the scheme described herein.

385.   By virtue of the false claims presented or caused to be presented by Defendants, the State of Massachusetts has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money

Civil Action No.  4:16-CV-00102

penalties of not less than $5,000 and not more than $10,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## **COUNT XIX**

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

386.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 and paragraphs 170 through 280 as though fully set forth herein.

387.   This is a claim under the Massachusetts False Claims Act, (Mass. Gen. Laws § 5A, *et seq*.).

388.   The Plaintiff/Relator has standing to maintain this action by virtue of the Massachusetts False Claims Act, (Mass. Gen. Laws § 5A, *et seq*.).

389.   By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of Massachusetts, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of Massachusetts, in violation of the Massachusetts False Claims Act.

390.   By virtue of, and as a result of, the false records and statements used to get false claims by the State of Massachusetts, the State of Massachusetts

Civil Action No.  4:16-CV-00102

suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,000 and not more than $10,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## **COUNT XX**

Claim  By and on Behalf of the  United States  under  the  False Claims Act Relating to Defendants' above-referenced conduct (Presenting False  Claims)

391.   Plaintiff realleges and incorporates by reference paragraphs 1 through 280 as though fully set forth herein.

392.   This is a claim under the New Jersey False Claims Act (NJ ST. 2A:32C-1, *et seq.*).

393.   The Plaintiff/Relator has standing to maintain this action by virtue of the New Jersey False Claims Act, (NJ ST. 2A:32C-1, *et seq.*).

394.   By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment  or  knowingly  caused  false  or  fraudulent  claims  for  payment  to  be presented, to officials to the State of New Jersey in violation of the New Jersey False Claims Act, (NJ St 2A:32C-1, *et seq.*).

Civil Action No.  4:16-CV-00102

395.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of New Jersey since the inception of the scheme described herein.

396.   By virtue of the false claims presented or caused to be presented by Defendants, the State of New Jersey has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT XXI

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

397.   Plaintiff realleges and incorporates by reference paragraphs 1 through 280 as though fully set forth herein.

398.   This is a claim under the New Jersey False Claims Act, (NJ ST 2A:32C-1, *et seq*.).

399.   The Plaintiff/Relator has standing to maintain this action by virtue of the New Jersey False Claims Act, (NJ ST. 2A:32C-1, *et seq*.).

400.   By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of New Jersey, Defendants

Civil Action No.  4:16-CV-00102

caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of New Jersey, in violation of the New Jersey False Claims Act.

401.   By virtue of, and as a result of, the false records and statements used to get false claims by the State of New Jersey, the State of New Jersey suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## <u>COUNT XXII</u>

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

402.   Plaintiff realleges and incorporates by reference paragraphs 1 through 206 as though fully set forth herein.

403.   This is a claim under the New York False Claims Act, (NY STATE FIN § 187, *et seq.*).

404.   The Plaintiff/Relator has standing to maintain this action by virtue of the New York Finance Law, (NY STATE FIN § 187, *et seq.*).

405.   By virtue of the acts described above with respect to Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or

Civil Action No.  4:16-CV-00102

fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of New York in violation of the New York False Claims Act.

406.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of New York since the inception of the scheme described herein.

407.   By virtue of the false claims presented or caused to be presented by Defendants, the State of New York has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $6,000 and not more than $12,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT XXIII

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

408.   Plaintiff realleges and incorporates by reference paragraphs 1 through 206 as though fully set forth herein.

409.   This is a claim on behalf of the State of New York under the New York False Claims Act, New York Finance Law Article XIII, (NY STATE FIN § 187, *et seq.*).

Civil Action No.  4:16-CV-00102

410.   The Plaintiff/Relator has standing to maintain this action by virtue of the York False Claims Act, New York Finance Law Article XIII, (NY STATE FIN § 187, *et seq.*).

411.   By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of New York, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of New York, in violation of the New York False Claims Act.

412.   By virtue of, and as a result of, the false records and statements used to get false claims by the Government, the State of New York suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $6,000 and not more than $12,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT XXIV

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

413.   Plaintiff realleges and incorporates by reference paragraphs 1 through 262 as though fully set forth herein.

Civil Action No.  4:16-CV-00102

414.  This is a claim under the North Carolina False Claims Act (N.C. G.S.A. § 108A-70-10, *et seq*.).

415.  The Plaintiff/Relator has standing to maintain this action by virtue of the North Carolina False Claims Act, (N.C. G.S.A. § 108A-70-10, *et seq*.).

416.  By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of North Carolina in violation of the North Carolina False Claims Act.

417.  The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of North Carolina since the inception of the scheme described herein.

418.  By virtue of the false claims presented or caused to be presented by Defendants, the State of North Carolina has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

Civil Action No.  4:16-CV-00102

## <u>COUNT XXV</u>

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

419.   Plaintiff realleges and incorporates by reference paragraphs 1 through 262 as though fully set forth herein.

420.   This is a claim under the North Carolina False Claims Act, (N.C. G.S.A. § 108A-70-10, *et seq*.).

421.   The Plaintiff/Relator has standing to maintain this action by virtue of the North Carolina False Claims Act, (N.C. G.S.A. § 108A-70-10, *et seq*.).

422.   By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of North Carolina, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of North Carolina, in violation of the North Carolina False Claims Act, (N.C. G.S.A. § 108A-70-10, *et seq*.).

423.   By virtue of, and as a result of, the false records and statements used to get false claims by the State of North Carolina, the State of North Carolina suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than

Civil Action No.  4:16-CV-00102

$11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## **COUNT XXVI**

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

424.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 and paragraphs 170 through 280 as though fully set forth herein.

425.   This is a claim under the Texas Medicaid Fraud Prevention Act, (TEX. HUM. RES. Code § 36.001, *et seq*.).

426.   The Plaintiff/Relator has standing to maintain this action by virtue of the Texas Medicaid Fraud Prevention Act, (TEX. HUM. RES. Code § 36.001, *et seq*. and Tex. Gov't Code Ann. § 531.101, *et seq*.).

427.   By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of Texas in violation of the Texas Medicaid Fraud Prevention Act.

428.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of Texas since the inception of the scheme described herein.

Civil Action No.  4:16-CV-00102

429.   By virtue of the false claims presented or caused to be presented by Defendants, the State of Texas has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of between $5,000 and $10,000 for each violation of the Act, escalated to $15,000 if the violation results in harm to an elderly person for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT XXVII

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

430.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 and paragraphs 170 through 280 as though fully set forth herein.

431.   This is a claim under Texas Medicaid Fraud Prevention Act, (TEX. HUM. RES. Code § 36.001, *et seq*. and Tex. Gov't Code Ann. § 531.101, *et seq*.).

432.   The Plaintiff/Relator has standing to maintain this action by virtue of the Texas Medicaid Fraud Prevention Act, (TEX. HUM. RES. Code § 36.001, *et seq*.).

433.   By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of Texas, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid

Civil Action No.  4:16-CV-00102

or approved by an agency of the State of Texas, in violation of the Texas Medicaid Fraud Prevention Act.

434.   By virtue of, and as a result of, the false records and statements used to get false claims by the State of Texas, the State of Texas suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of between $5,000 and $10,000 for each violation of the Act, escalated to $15,000 if the violation results in harm to an elderly person for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT XXVIII

Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims)

435.   Plaintiff realleges and incorporates by reference paragraphs 1 through 280 as though fully set forth herein.

436.   This is a claim under the Virginia Fraud Against Taxpayers Act, § 8.01 – 216.1.

437.   The Plaintiff/Relator has standing to maintain this action by virtue of the Virginia Fraud Against Taxpayers Act, § 8.01 – 216.1.

438.   By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for

Civil Action No.  4:16-CV-00102

payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of Virginia in violation of the Virginia Fraud Against Taxpayers Act.

439.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of Virginia since the inception of the scheme described herein.

440.   By virtue of the false claims presented or caused to be presented by Defendants, the State of Virginia has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## <u>COUNT XXIX</u>

Claim  By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

441.   Plaintiff realleges and incorporates by reference paragraphs 1 through 280 as though fully set forth herein.

442.  This is a claim under the Virginia Fraud Against Taxpayers Act, § 8.01 – 216.1.

443.   The Plaintiff/Relator has standing to maintain this action by virtue of the Virginia Fraud Against Taxpayers Act, § 8.01 – 216.1.

Civil Action No.  4:16-CV-00102

444.   By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of Virginia, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of Virginia, in violation of the Virginia Fraud Against Taxpayers Act, § 8.01 – 216.1.

445.   By virtue of, and as a result of, the false records and statements used to get false claims by the State of Virginia, the State of Virginia suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## **COUNT XXX**

Claim  By and on Behalf of the  United States  under  the  False Claims Act Relating to Defendants' above-referenced conduct (Presenting False  Claims)

446.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 and paragraphs 170 through 262 as though fully set forth herein.

447.   This is a claim under the Washington State Medicaid Fraud False Claims Act, (RCW 74.66.005, *et seq*.).

Civil Action No.  4:16-CV-00102

448.   The Plaintiff/Relator has standing to maintain this action by virtue of the Washington State Medicaid Fraud False Claims Act, (RCW 74.66.005, *et seq*.).

449.   By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of Washington in violation of the Washington State Medicaid Fraud False Claims Act.

450.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of Washington since the inception of the scheme described herein.

451.   By virtue of the false claims presented or caused to be presented by Defendants, the State of Washington has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT XXXI

Claim  By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements)

452.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 and paragraphs 170 through 262 as though fully set forth herein.

Civil Action No.  4:16-CV-00102

453.   This is a claim under the Washington State Medicaid Fraud False Claims Act, (RCW 74.66.005, *et seq*.).

454.   The Plaintiff/Relator has standing to maintain this action by virtue of the Washington State Medicaid Fraud False Claims Act, (RCW 74.66.005, *et seq*.).

455.   By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of Washington, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of Washington, in violation of the Washington State Medicaid Fraud False Claims Act, (RCW 74.66.005, *et seq*.).

456.   By virtue of, and as a result of, the false records and statements used to get false claims by the State of Washington, the State of Washington suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT XXII

### FALSE CLAIMS ACT
### 31 U.S.C. § 3730(h)
### (Defendant PSA)

457.   Plaintiff realleges and incorporates by references in paragraphs 1 through 280 as though fully set forth herein.

Civil Action No. 4:16-CV-00102

458. This is a claim for damages under the False Claims Act, 31 U.S.C. § 3730(h).

459. From the beginning of her employment in August 2015, Relator reported her good faith belief that Defendants may be violating the False Claims Act as set forth herein to Defendant PSA's employees and management officials.

460. In August 2015, Debbie Lewis, Vice President, Operations Development told Relator in no uncertain terms not to use "the fraud word" and sought to silence her and intimidate her in violation of the provisions of 31 U.S.C. § 3730(h) and Various State Acts prohibiting discrimination by employers against employees who investigate and/or report violations of the False Claims Act and various state false claims act, anti-retaliation provisions and PSA's internal Compliance Policies.

461. Relator's Manager, Merab McCarty repeatedly told her to "lay low" so that she would not be terminated and sought to silence her in violation of the provisions of 31 U.S.C. § 3730(h) and Various State Acts prohibiting discrimination by employers against employees who investigate and/or report violations of the False Claims Act and various state false claims act, anti-retaliation provisions and PSA's internal Compliance Policies.

462. At all times relevant hereto, Relator was discriminated against for reporting violations of the False Claims Act and various false state claims acts.

Civil Action No.  4:16-CV-00102

463.   As a direct and proximate result of the of Relator's employment, Relator has sustained, among other things, emotional distress, fear and anxiety.

464.   As a direct and proximate result of Defendant PSA's conduct, Relator is entitled to recover two times the amount of back pay, interest on the back pay, special damages, attorney's fees and costs incurred herein.

465.   Defendant PSA's acts against Relator were willful, wanton and malicious and violated Relator's federally-protected rights and Relator is entitled to recover punitive and exemplary damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States and the states of Georgia, California, Colorado, Connecticut, Florida, Illinois, Louisiana, Massachusetts, New Jersey, New York, North Carolina, Texas, Virginia and Washington demand and pray that judgment to be entered in their favor as follows against Defendants jointly and severally:

466.   On Counts I, II, and III under the False Claims Act, against Defendants for treble the amount of the United States' actual damages (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

467.   On Counts IV and V, under the Georgia State False Medicaid Claims Act, against Defendants for treble the amount of actual damages suffered by the

Civil Action No.  4:16-CV-00102

State of Georgia (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

468.   On Counts VI and VII, under the California False Claims Act, against Defendants for treble the amount of the State of California actual damages (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

469.   On Counts VIII and IX, under the Colorado Medicaid False Claims Act, against Defendants for treble the amount of the State of Colorado actual damages (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

470.   On Counts X and XI, under the Connecticut False Claims Act for Medical Assistance Programs, against Defendants for treble the amount of actual damages suffered by the State of Connecticut (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

471.   On Counts XII and XIII, under the Florida False Claims Act, against Defendants for treble the amount of the State of Florida's actual damages (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

Civil Action No.  4:16-CV-00102

472.   On Counts XIV and XV, under the Illinois Whistleblower Reward and Protection, against Defendants for treble the amount of actual damages suffered by the State of Illinois (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

473.   On Counts XVI and XVII, under the Louisiana False Claims Act/Medical Assistance Programs, against Defendants for treble the amount of the State of Louisiana actual damages (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

474.   On Counts XVIII and XIX, under the Massachusetts False Claims Act, against Defendants for treble the amount of actual damages suffered by the State of Massachusetts (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

475.   On Counts XX and XXI, under the New Jersey False Claims Act, against Defendants for treble the amount of actual damages suffered by the State of New Jersey (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

476.   On Counts XXII and XXIII New York False Claims Act, against Defendants for treble the amount of the State of New York's actual damages

Civil Action No.  4:16-CV-00102

(including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

477.   On Counts XXIV and XXV, under the North Carolina False Claims Act, against Defendants for treble the amount of actual damages suffered by the State of North Carolina (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

478.   On Counts XXVI and XXVII, under the Texas Medicaid Fraud Prevention Act, against Defendants for treble the amount of actual damages suffered by the State of Texas (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action and as otherwise authorized under Tex. Gov't Code Ann. § 531.101, *et seq.*

479.   On Counts XXVIII and XXIX, under the Virginia Fraud Against Taxpayers Act, against Defendants for treble the amount of actual damages suffered by the State of Virginia (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

480.   On Counts XXX and XXXI, under the Washington State Medicaid Fraud False Claims Act, against Defendants for treble the amount of actual damages suffered by the State of Washington (including investigative costs), plus

Civil Action No.  4:16-CV-00102

civil penalties as are allowable by law for each false claim or record and for all

costs of this civil action;

481.  For all costs of this civil action; and

482.  For such other and further relief as the Court deems just and equitable.

WHEREFORE, Relator demands and prays that judgment be entered in her

favor:

1.      On Counts I, II, and III under the False Claims Act, for a percentage

of all civil penalties and damages obtained from Defendants pursuant to 31 U.S.C.

§ 3730, reasonable attorney's fees and all costs incurred against Defendants;

2.      On Counts IV and V, under the Georgia State False Medicaid Claims

Act, for a percentage of all civil penalties and damages from Defendants pursuant

to the Georgia State False Medicaid Claims Act, reasonable attorney's fees and all

costs incurred against Defendants;

3.      On Counts VI and VII, under the California False Claims Act, for a

percentage of all civil penalties and damages from Defendants pursuant to the

California False Claims Act, reasonable attorney's fees and all costs incurred

against Defendants;

4.      On Counts VIII and IX, under the Colorado Medicaid False Medicaid

Claims Act, for a percentage of all civil penalties and damages from Defendants

Civil Action No. 4:16-CV-00102

pursuant to the Colorado State False Medicaid Claims Act, reasonable attorney's fees and all costs incurred against Defendants;

5. On Counts X and XI, under the Connecticut False Claims Act for Medical Assistance Programs, for a percentage of all civil penalties and damages from Defendants pursuant to the Connecticut False Claims Act for Medical Assistance Programs, reasonable attorney's fees and all costs incurred against Defendants;

6. On Counts XII and XIII, under the Florida False Claims Act, for a percentage of all civil penalties and damages from Defendants pursuant to the New Florida False Claims Act, reasonable attorney's fees and all costs incurred against Defendants;

7. On Counts XIV and XV, under the Illinois Whistleblower Reward and Protection Act, for a percentage of all civil penalties and damages from Defendants pursuant to the Illinois Whistleblower Reward and Protection Act, reasonable attorney's fees and all costs incurred against Defendants;

8. On Counts XVI and XVII, under the Louisiana State False Claims Act/Medical Assistance Programs, for a percentage of all civil penalties and damages from Defendants pursuant to the Louisiana State False Claims Act/Medical Assistance Programs, reasonable attorney's fees and all costs incurred against Defendants;

Civil Action No.  4:16-CV-00102

9.      On Counts XVIII and XVIX, under the Massachusetts False Claims Act, Programs, for a percentage of all civil penalties and damages from Defendants pursuant to the Massachusetts False Claims Act, reasonable attorney's fees and all costs incurred against Defendants;

10.      On Counts XX and XXI, under the New Jersey False Claims Act, for a percentage of all civil penalties and damages from Defendants pursuant to the New Jersey False Claims Act, reasonable attorney's fees and all costs incurred against Defendants;

11.      On Counts XXII and XXIII, under the New York False Claims Act, for a percentage of all civil penalties and damages from Defendants pursuant to the New York False Claims Act, reasonable attorney's fees and all costs incurred against Defendants;

12.      On Counts XXIV and XXV, under the North Carolina False Claims Act, for a percentage of all civil penalties and damages from Defendants pursuant to the North Carolina False Claims Act, reasonable attorney's fees and all costs incurred against Defendants;

13.      On Counts XXVI and XXVII, under the Texas Medicaid Fraud Prevention Act, for a percentage of all civil penalties and damages from Defendants pursuant to the Texas Medicaid Fraud Prevention Act, reasonable

Civil Action No.  4:16-CV-00102

attorney's fees and all costs incurred against Defendants and was otherwise permitted under Tex. Gov't Code Ann. § 531.101, *et seq.*);

14.    On Counts XXVIII and XXIX, under the Virginia Fraud False Claims Act for Medical Assistance Programs, for a percentage of all civil penalties and damages from Defendants pursuant to the Connecticut False Claims Act for Medical Assistance Programs, reasonable attorney's fees and all costs incurred against Defendants;

15.    On Counts XXX and XXXI, under the Washington State Medicaid Fraud False Claims Act, for a percentage of all civil penalties and damages from Defendants pursuant to the Washington State Medicaid Fraud False Claims Act, reasonable attorney's fees and all costs incurred against Defendants;

16.    Directing Defendant PSA to place Plaintiff/Relator in a position where she would have held but for Defendant PSA's discriminatory and retaliatory treatment of her and to make Plaintiff/Relator whole for all earnings and benefits she would have received but for Defendant PSA's discriminatory and retaliatory treatment including but not limited to wages (including front and back pay and interest thereon) and benefits and any and all other relief afforded under the whistleblower protections contained in 31 U.S.C. § 3730(h), Georgia Code § 49-4-168.4 and the protection of employees from discrimination and retaliation under the aforementioned applicable State Acts.

Civil Action No.  4:16-CV-00102

17.    That Plaintiff/Relator recover general compensatory damages in an amount to be proven at trial;

18.    That Plaintiff/Relator recover punitive and exemplary damages in an amount to be proven at trial;

19.    Plaintiff/Relator recover prejudgment and postjudgment interest; and

20.    Such other relief as the Court deems just and proper.

Respectfully submitted this 21st day of November, 2016.

/s/ Michael J. Moore
Michael J. Moore
Georgia Bar No. 520109
Courtney L. Engelke
Georgia Bar No. 566460
POPE McGLAMRY, P.C.
3391 Peachtree Road, NE, Suite 300
P.O. Box 191625 (31119-1625)
Atlanta, GA  30326
(404) 523-7706
Fax:  (404) 524-1648
Email:  efile@pmkm.com
Attorneys for Relator, Tracy Payton

Raymond L. Moss
Georgia Bar No. 526569
MOSS & GILMORE LLP
3630 Peachtree Road, Suite 1025
Atlanta, GA  30326
(678) 381-8601
Fax:  (815) 364-0515
Email:  rlmoss@mossgilmorelaw.com
Attorneys for Relator, Tracy Payton

Civil Action No.  4:16-CV-00102

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of November, 2016 I electronically filed the foregoing with the U.S. District Court for the Southern District of Georgia by using the Court's CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Charles W. Mulaney
U.S. Attorney's Office - Savannah
P.O. Box 8970
Savannah, GA  31412
Email:  charles.mulaney@usdoj.gov

Darcy F. Coty
U.S. Attorney's Office - ATL
600 Richard Russell Building
75 Ted Turner Drive, SW
Atlanta, GA  30303
Email:  dcoty@usa.doj

John Thomas Clarkson
U.S. Attorney's Office - Savannah
P.O. Box 8970
Savannah, GA  31412
Email:  thomas.clarkson@usdoj.gov

Neeli Ben-David
U.S. Attorney's Office - ATL
600 Richard Russell Building
75 Ted Turner Drive, SW
Atlanta, GA  30303
Email:  neeli.ben-david@usdoj.gov

Elizabeth White
200 Piedmont Ave., SE, West Tower, 19th Floor
Atlanta, GA  30334
Email:  ewhite@law.ga.gov

Civil Action No.  4:16-CV-00102

Nancy Bailey Allstrom
Office of the Attorney General - Tucker
2100 E. Exchange Place, Suite 200, Bldg. One
Tucker, GA  30084-5336
Email:  nallstrom@law.ga.gov

Rebekah N. Plowman (admitted PHV)
Kristen Pollock McDonald (admitted PHV)
Laura K. Gura (admitted PHV)
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, GA 30309
Email:  rplowman@jonesday.com
        kmcdonald@jonesday.com
        lgura@jonesday.com
*Counsel for Defendants Pediatric Services of America, Inc. (GA), Pediatric Services of America, Inc. (DE), Pediatric Home Nursing Services, Pediatric Services Holding Corporation, and J.H. Whitney Capital Partners, LLC*

Christopher R. Jordan
THE JORDAN FIRM
1804 Frederica Road, Suite C
Saint Simons Island, GA  31522-2044
Email:  cjordan@jordanfirmlaw.com
*Counsel for Defendants Pediatric Services of America, Inc. (GA), Pediatric Services of America, Inc. (DE), Pediatric Home Nursing Services, Pediatric Services Holding Corporation, J.H. Whitney Capital Partners, LLC, and Portfolio Logic, LLC*

Richard A. Sauber (PHV motion pending)
D. Hunter Smith (PHV motion pending)
ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER &
   SAUBER LLP
1801 K Street, NW, Suite 411L
Washington, DC  20006
Email:  rsauber@robbinsrussell.com
        hsmith@robbinsrussell.com
*Counsel for Portfolio Logic, LLC*